**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 12, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

HENRY PETER WOODY, JR.,

Defendant - Appellant.

No. 06-2100
(D.C. No. CR-04-1345-MCA)
(D.N.M.)

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

LARRY WOODY,

Defendant - Appellant.

No. 06-2104
(D.C. No. CR-04-1345-MCA)
(D.N.M.)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **O'BRIEN**, Circuit Judge.

---

**PER CURIUM**

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

In these consolidated appeals, Defendants-Appellants Henry Peter Woody, Jr., and Larry Woody (collectively "Defendants," individually "Henry" and "Larry") appeal from their convictions for second-degree murder in violation of 18 U.S.C. § 1111(a), § 1153(a) and § 2. On October 21, 2005, following a four-day jury trial, Defendants, who are brothers, were found guilty in connection with the stabbing death of Kenneth Tutt on the Navajo Indian Reservation in Shiprock, New Mexico. The district court sentenced Henry to 262 months imprisonment and 5 years supervised release and Larry to 235 months imprisonment and 5 years supervised release.

Defendants challenge their convictions on four grounds: (1) Larry argues there was insufficient evidence adduced at trial to support his conviction; (2) both Henry and Larry argue evidence was admitted at trial in violation of Fed. R. Evid. 401 and 403; (3) Larry challenges several of the prosecutor's remarks made during closing arguments; and (4) Henry argues the district court erroneously imposed a special condition on his supervised release without giving prior notice pursuant to Fed. R. Crim. P. 32(h). Exercising jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we reverse both convictions -- Larry's due to insufficient evidence and Henry's due to the erroneous admission of evidence substantially prejudicial to his defense.

I. <u>Background</u>

In the early morning hours of April 26, 2004, Kenneth Tutt's body was discovered under a tree behind the City Market in Shiprock, New Mexico. The area in which Tutt's body was discovered is known to be frequented by transients. It was later determined that the cause of Tutt's death was a stab wound to the left side of his neck.

On February 25, 2005, a federal grand jury returned a second superseding indictment charging Defendants with the second-degree murder of Tutt. After the district court denied the government's motion to sever, trial commenced on October 17, 2005, and ended on October 20, 2005. The jury returned guilty verdicts against Defendants the following day. In sentencing Defendants, the district court imposed, without notice, a condition of supervised release that both Defendants submit to suspicionless searches of their property and persons whenever requested by law enforcement.

Because we must review the record for sufficiency of the evidence in Larry's appeal and for the admission of unfairly prejudicial evidence in Henry's appeal, we recount in some detail the pertinent portions of the trial testimony. Prosecution witness, Officer Brenda Harrison with the Navajo Nation Department of Law Enforcement, was the first officer to arrive on scene after Tutt's body was discovered on April 26. She observed a pair of broken sunglasses and a baseball cap near the body. She also observed blood splatters on the tree branches near

Tutt's head. She and another officer did not locate any other evidence in the area surrounding the crime scene. Harrison also testified she was familiar with Defendants prior to Tutt's death and both of them usually carried backpacks. At some point during the investigation of the crime scene, the authorities received information from Nelvis Dawes, a man who resided between 100 and 200 yards from where Tutt's body was found, that led them to focus their attention on Defendants. The information gleaned from Dawes also led police to the property of Barbara Litson for the purpose of searching a shack occupied by Paul Hayes, Jr. At around 11:00 a.m., the authorities received permission from Litson to search the shack, and, based on something they found during the search, the shack was secured until a search warrant could be obtained.

George Joe, the individual who called law enforcement to report the discovery of Tutt's body, testified next. He explained a friend had informed him there was a body behind the City Market. Joe also testified that he had known Defendants for three or four years and had seen them in the vicinity of the City Market in the early afternoon on April 25. He described how Larry typically wore blue jeans, tennis shoes, sunglasses that fold over the eyes, and a cap. Henry typically wore square sunglasses, a light blue jacket, blue jeans, and tennis shoes. Later, during cross-examination, Joe confirmed Henry was wearing a light blue windbreaker on April 25, the day before the body was discovered.

Phillip Joe, the second law enforcement officer to arrive on scene after

Tutt's body was discovered, testified to observing broken wrap-around style sunglasses near the victim and described the general area around the body as "somewhat trashy." (R. Vol. IX at 59.) He explained the Hayes shack was located right next to the street and was "pretty simply put together with numerous rough material, lumber, bark wood, plywood, and the front of the shed was or the entrance was unsecured." (Id. at 67.) Hayes was not in the shack at the time of the search. Next, Officer Joe detailed how he searched the shack and discovered what appeared to be a bloody steak knife within a cupboard. On redirect examination, Officer Joe testified that, at the time of the search, he also noticed a portion of a blue jacket with reflective tape on it stuck behind a mattress. Later in the trial, Officer Joe claimed a jacket seized from Henry following his arrest was similar to the blue jacket he had seen in the shack on April 26.

Shirley Hayes, Paul Hayes's aunt, who also lives on the property with Litson, testified as follows: Hayes was indeed living in the shack on April 25; Defendants were staying at the shack on the afternoon of April 25; and food from a birthday party was sent out to them at around 4:00 p.m. She opined that Henry always wore a light or dark blue windbreaker, Larry always wore a blue and white jacket, and both of them always carried backpacks.

Litson was called next and testified that when she returned home from Las Vegas, Nevada, on the evening of April 25, nobody was at the shack. She confirmed, however, that sometime before 10:00 a.m. on the morning of April 26

she saw Defendants walking near the shack and both were holding bags.

Dawes was next.  He said Defendants had been in the Shiprock area in the month and a half preceding Tutt's death.  He observed the following on the evening of April 25:

> And I seen a bunch of people walking as a group, and there was this one individual that they were kicking, and he kept falling down.  He would get up, and they would kick him again.  And then the taller one would eventually help him up, and it seems like he was getting his hits in at the same time, too.  And he would get up again, and he would kick him down again.  And finally, they just kept on doing that, and they just kept on walking.

(R. Vol. X at 165.)  Dawes recalled a total of six individuals in the group—the victim of the beatings, the two individuals inflicting blows, and three observers who were just following.  He thought nothing of the incident because fights happen all the time in that area of Shiprock; he turned away to return to his work.  When he looked outside again a half an hour later, he saw nothing.   Dawes identified Henry as the individual kicking the victim and Larry as the individual hitting the victim, but did not testify he ever observed a weapon in the hands of either.  When the prosecution showed Dawes the shirt Tutt was found wearing when his body was discovered on April 26, Dawes confirmed the victim of the beatings he observed was wearing the same shirt.  On cross-examination, Dawes admitted the only way he even recognized Larry was by his height, and claimed that Larry was hitting the victim with only his right hand.

Next, the government called four expert witnesses to discuss the scientific

evidence (or lack thereof). First, Sandra Koch, a forensic examiner in the trace evidence (hairs and fibers) unit of the FBI, testified she could not match any hairs from Tutt to those found on the items seized from Henry's backpack. Lora J. Gioeni, a forensic examiner in the mitochondrial DNA unit at the FBI, testified that, based on DNA testing, Tutt could be excluded as a possible source of a hair found on Henry's backpack. Julie Ann Kidd, a DNA and serology (the study of bodily fluids) examiner with the FBI, testified she performed DNA testing on Henry's boots, a jacket, a pair of pants, a t-shirt, and a backpack. Tutt's DNA was not found on any of these items. Nor was either Defendants' DNA found under Tutt's fingernails. DNA extracted from blood found on the handle and blade of the knife located in Hayes's shack matched Tutt's DNA to a reasonable degree of scientific certainty but no latent fingerprints—from Defendants or anyone else—were found on the knife.

The government's final scientific expert was Dr. Jeffrey Nine, the forensic pathologist who performed an autopsy on Tutt. According to Dr. Nine, Tutt's blood-alcohol level was .142 at the time of his death. Dr. Nine testified the cause of death was a stab wound "on the left side of the neck just above like the collarbone area, and that penetrated about two and a half inches into the neck tissues both perforating and penetrating a couple of major blood vessels, the cephalic artery and carotid artery, resulting in a lot of blood loss . . . ." (Id. at 265-66.) Tutt also exhibited a number of other injuries (mostly scrapes and

bruises), including a superficial knife wound to the neck. In Dr. Nine's opinion, both of the stab wounds to Tutt's neck were consistent with having been inflicted by a knife like the one found in Hayes's shack. He admitted during cross-examination, however, an inability to determine whether the wound was inflicted by a right-handed or left-handed assailant. He also estimated Tutt would have lost two and a half quarts of blood before he died.

The next witness for the government was Paul Hayes who was not an eager witness. The government secured his presence by arrest for failing to comply with a subpoena. When he was called as a witness, prior to any questioning, the trial court addressed Hayes as follows: "Now, you have been given the oath, and you have promised to tell the truth. Do you understand that?" (R. Vol. XI at 329.) No other witness was addressed in this manner.

Hayes began his testimony by explaining that on April 25, 2004, he was living in the shack on Litson's property, but did not see Defendants that afternoon. He went on to testify: (1) he spent the night in the shack on April 25th but did not remember seeing either Henry or Larry; (2) his father and a female friend also spent the night at the shack on April 25, but they left the next morning around 7:00 or 8:00 a.m.; and (3) he did not see Defendants in the morning either. He then offered this description of the shack:

> I can tell you this. Over at my dad's house, we have no door. We use a curtain for a door. And on the other side is a car hood, and we chain it up, and then we leave. Sometimes we come back, and the door's

already opened again.

(Id. at 340.)

Hayes was interviewed by FBI Agent William Hall on April 29, three days after Tutt's body was discovered. When Hayes testified he could not remember what he said to Agent Hall, the court allowed him to silently read Hall's report to refresh his memory.  Due to a concern Hayes may have difficulty reading the report in English, the court called a translator to read the report to Hayes in Navajo.[1]  After Hayes stated he understood the substance of the report, the government renewed its questioning as follows:

Q:    And this is a statement that you gave to Mr. Hall and Mr. Deale at the BIA office, do you recollect that?

A:    Yes.

. . . .

Q:    Okay.  Now . . . I'm going to ask you about the statement at the bottom . . . of Page 1, the last sentence.  Do you remember making that statement?

A.    No.

Q.    Do you remember the agent asking you about Henry Woody?

A.    No.

Q.    Okay.  Do you remember telling the agent that Henry Woody stutters

_____

[1] The record is not clear whether the translator read the report to Hayes within the hearing of the jury, but unless the jurors understood the Navajo language, it would not matter.

when he gets scared?

A:     No.

. . . .

Q:     Do you remember telling the agent that you saw Henry Woody two
       days after Mr. Tutt's death, on the 28th?

A:     No.

Q:     And do you remember telling him that Henry Woody told you not to
       say anything?

A:     No.

Q:     You don't remember that?

A:     No.

Q:     Do you remember telling me this morning that when Henry Woody
       gets nervous, that he stutters?

A:     No.

Q:     Do you remember talking to me downstairs this morning about 7:30
       a.m. . . . ?

A:     Yes.

Q:     But you don't remember telling me that?

A:     No.

(R. Vol. XI at 347-48.)  The court then intervened (with the jury present)[2]:

---

[2]  "In jury cases, proceedings shall be conducted, to the extent practicable,
so as to prevent inadmissible evidence from being suggested to the jury by any
means, such as making statements or offers of proof or asking questions in the
hearing of the jury."  Rule 103(c).  Federal Rules of Evidence.  A judge's

The Court:   Mr. Hayes, do you understand the questions that the lawyer is asking you?

The Witness:      No.

The Court:   Look at me when I talk to you.  You took an oath this morning to tell the truth.  Do you understand that?

. . . .

The Court:   You swore to tell the truth, you promised to tell the truth as to all questions that . . . would be asked.

The Witness:      Yes.

The Court:   I have concerns that you are not honoring . . . that oath.  Mr. Hayes, what is it about the questions that you do not understand?  Tell me.

The Witness:      I understand everything.  There's some things that's written there.  I don't think I said those things.

(Id. at 349.)  When further questioning received the same type of response, the jury was sent on break.  The court again admonished Hayes regarding his evasiveness and warned he was treading close to contempt.

Still outside the presence of the jury, the government suggested Hayes was afraid of the Defendants and his fear was the source of his contrived lack of memory.  The court questioned Hayes regarding this suggestion, but Hayes denied being afraid or receiving any threats from the Defendants.  Henry objected to the form of the government's questioning.  The court responded to the prosecutor, "I

_____

suggestion that a witness is not being truthful would seem to be best made outside of the jury's presence.

do have concern with the amount of detail here that you are noting, [counsel],

with respect to the substance of the statements that you have." (Id.) The

prosecution replied, "Your Honor, just so the Court is aware, the reason I'm doing

or going into detail because my intention is to call Agent Hall and get these

[statements in] under the Rules of Evidence . . . prior inconsistent [statements] . .

. ." (Id.) There was no further discussion and the jury returned to the courtroom.

The questioning resumed in the same form. After several minutes, the

court spoke to the jury, stating:

> [L]et me just remind the jurors. Some of the earlier instructions that
> I have given, which I will give from time to time again throughout
> the course of this trial, you are to determine the facts solely from the
> evidence admitted in this case. The evidence consists of the
> testimony of witnesses and the exhibits that are received in evidence.
> Questions asked by the lawyers are not evidence, for the evidence
> consists of the witnesses' answers to the questions, not the questions
> themselves. Let us continue.

(Id. at 360-361.) Eventually, the government reached the point where it tried to

elicit Hayes's reported statement to Agent Hall describing the Defendants'

conduct when they drink or get angry. It inartfully asked, "And what, in fact, did

you tell the agent about Larry Woody when they [sic] get mad?" (Id. at 363.)

Henry objected alleging the statement was irrelevant and unduly prejudicial under

Rule 403. The court did not address Rule 403 but, rather, told the prosecutor to

lay a better foundation and ruled it would permit the question. These questions

followed:

Q      Now, so when you made this statement about how they act
        when they get mad, what made you tell the agent that?

A      Well, like I said, what Larry does is when he gets mad and then when
        we try to joke around, he just gets mad and hits me or some other
        people there.  Then he hits them, too.

Q.     And then did you tell the agent that he talked about killing people
        when he gets mad?

A.     That, I don't remember.

(Id. at 366.)[3]

Agent Hall was the government's final witness.  Assigned to investigate

Tutt's murder, Hall responded to the crime scene early on April 26 and at

approximately 11:00 a.m. he was informed of the search of Hayes's shack and the

discovery of the bloody knife.  In response, he prepared a search warrant and

affidavit, and after obtaining a search warrant, seized the knife.  He next

described how he interviewed Henry in Cortez, Colorado, a couple of weeks after

the murder.  During that interview, Henry claimed he had heard about Tutt's

death on the radio and then spontaneously volunteered, "I'm innocent.  I don't

even know that guy." (Id. at 88 (quotations omitted)).  Henry later referred to Tutt

as Ken, leading Agent Hall to believe Henry had indeed known Tutt.

Henry eventually admitted to Agent Hall during the interview that on April

_____

[3]  Perhaps realizing he had focused solely on Larry, the prosecutor later
attempted to re-ask the question by stating, "[The report] says, 'When Larry and
Henry get together and drink, they threaten,'" but the court sustained an objection
on the basis the question had been asked and answered.  (R. Vol. XI at 367.)

-13-

25 he had been drinking with Tutt behind the City Market. With regard to the moment when Tutt was stabbed, Henry advised Hall, "he got up and bent over, and it happened really fast." (Id. at 390.) Henry claimed that after the stabbing he went back to Hayes's shack and fell asleep. Henry described the murder weapon "as a fixed blade hunting style knife with a four-inch blade [and] a black handle." (Id. at 391.)

Agent Hall detailed two interviews he conducted with Larry, during which Larry also admitted to being with Tutt on the day he was slain. Larry claimed that on April 25 he encountered Tutt, who requested that Larry go into the City Market and purchase some "ocean"[4] for them to consume. After Larry purchased mouthwash and gave Tutt his change, the two drank "ocean." Larry claimed he then went back to Hayes's shack and spent the night. When confronted specifically about Tutt's death, Larry blurted out, "I didn't stab him or I would have blood all over my jeans." (Id. at 395 (quotations omitted).)

The government then moved to Hayes's statements to Hall regarding Defendants' propensity for violence when drinking. Because Hayes denied making the statements, the government was allowed to elicit impeachment testimony from Agent Hall. Hall testified Hayes told him, "'[When Henry and

_____

[4] "Ocean" is a substitute for alcoholic beverages which are unavailable on the Navajo Reservation. It is created by diluting either mouthwash or hairspray with water. The mixture is then consumed and, apparently, can be the equivalent of consuming 80 proof liquor.

Larry] get mad, they talk about killing people' and [Hayes] went on to say, 'When they get together and drink, they also threaten people.'" (Id. at 402.) When the jury returned from lunch, the court properly instructed the jury that such evidence was admissible only to impeach the credibility of the witness and not to establish the truth of Hayes's statements.

On cross-examination, Hall testified that, at the time of his first interview with Larry on April 28, Larry's right hand was extremely swollen (his fingers were twice the normal diameter) and he had sutures on one of his fingers. Larry told Hall he had surgery on his right hand in early April, a fact Hall independently corroborated through medical records. Hall admitted he had previously testified before a grand jury saying: "It's my belief, based on what I saw of Larry Woody's hand, that he could not have stabbed someone." (Id. at 422 (quotations omitted).) After evaluating the crime scene, Hall believed the assailant was right-handed and Larry would not have been able to make a fist without injuring the surgery wound. Hall further testified that, during a prior investigative interview, Dawes had said four of the five men he saw on April 25 were kicking Tutt, but that one individual—who was wearing a blue jacket, black pants, and black plastic wrap-around sunglasses—did most of the pushing and kicking.

At the conclusion of Hall's testimony, the government rested and Defendants moved for judgments of acquittal. The judge denied the motions,

finding sufficient evidence as to each element of the charged offenses. The Defendants chose not to put on any evidence. Following jury instructions and closing arguments, the case was submitted to the jury.

Larry now argues the government presented insufficient evidence from which a reasonable jury could find he caused Tutt's death. Larry also takes issue with several of the prosecutor's statements made during closing argument, including one suggesting he might have enjoyed killing the victim "in a primitive and human recreational kind of way thinking that he would never be in front of you guys [the jury]." (R. Vol. XII at 486.) Both Larry and Henry contend the district court committed reversible error when it allowed the prosecutor to question Hayes and Agent Hall regarding Hayes's prior statements that the Defendants get violent and threaten to kill people when drinking and angry. Finally, Henry argues the court erred in attaching the suspicionless search condition upon his supervised release without first giving notice pursuant to Fed. R. Crim. P. 32(h).

## II. Discussion

### A. Introduction

Since Henry and Larry were co-defendants much of the evidence was overlapping. We take care to delineate the scope of our review with regard to each of the brothers because Larry briefed and argued insufficiency of the evidence, but Henry did not. Henry has waived any such argument as a result of

his failure to raise and brief the issue. See State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 984 n.7 (10th Cir. 1994) (failure to raise an issue in the appellate brief waives that issue).

B.    Larry Woody

We begin and end our discussion of Larry's appeal by addressing the sufficiency of the evidence. The requirement for the government to prove each essential element of a crime beyond a reasonable doubt is of immense importance in our criminal justice system. See In re Winship, 397 U.S. 358, 363-64 (1970) ("a society that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is reasonable doubt about his guilt"). Accordingly, we review the sufficiency of the evidence de novo. United States v. Voss, 82 F.3d 1521, 1524-25 (10th Cir. 1996). In so doing, we must "view[] the evidence in the light most favorable to the government" and ask whether "any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt." United States v. Vallo, 238 F.3d 1242, 1247 (10th Cir. 2001); accord Jackson v. Virginia, 443 U.S. 307, 319 (1979). The discretion to resolve conflicting testimony, weigh the evidence, and draw inferences from basic facts to ultimate facts lies with the jury. United States v. Nieto, 60 F.3d 1464, 1469 (10th Cir. 1995). On the other hand, the evidence relied upon to support a conviction must be substantial and raise more than a mere suspicion of guilt . United States v. Jameson, 478 F.3d 1204, 1208 (10th Cir.),

*cert. denied*, ___ S.Ct. ___, 2007 WL 300493 (2007) . Inferences may be properly drawn from the evidence but, to be reasonable, an inference must be based on more than mere conjecture and speculation, United States v. Atencio, 435 F.3d 1222, 1232 (10th Cir.), *cert. denied*, 126 S.Ct. 2310 (2006), and the jury is not permitted to arrive at a guilty verdict by piling inference upon inference, Jameson, 478 F.3d at 1208.

To convict of second-degree murder under 18 U.S.C. §§ 1111(a) and 1153(a), the government must show the defendant (1) is American Indian (2) who killed the victim (3) unlawfully (4) with malice and (5) committed the crime within Indian Country. See United States v. Visinaiz, 428 F.3d 1300, 1306 (10th Cir. 2005), *cert. denied*, 546 U.S. 1123 (2006). All parties concede Defendants are Indians and Tutt, also an Indian, was killed in Indian Country. Indeed, the only element with which Larry takes issue, and we think correctly, is whether the evidence was sufficient to convict him. See United States v. Swallow, 109 F.3d 656, 659 (10th Cir. 1997) ("Proximate cause of death is an essential component of both first-and second-degree murder.").

Both Henry and Larry denied involvement; neither self defense nor any other type of justification was at issue. Thus, the primary question is whether the evidence submitted to the jury was sufficient to prove beyond a reasonable doubt Larry killed Tutt or whether he aided and abetted the murder.

Upon close examination of the testimony and evidence adduced against

Larry, we conclude no rational trier of fact could have found him guilty of second-degree murder beyond a reasonable doubt. While there was certainly evidence indicating he was involved (along with others) in an assault of Tutt, the cause of death was not the assault, but rather a stabbing. Even viewed in the light most favorable to the government, the evidence simply does not sufficiently link Larry with the stabbing. The jury could have concluded the Defendants stayed at Hayes's shack the night before the murder weapon was found there. But the evidence also demonstrates the murder weapon was not discovered for over twelve hours after the stabbing allegedly occurred, at least three other individuals—Paul Hayes, Jr., his father and his father's girlfriend—stayed at the shack on the night of April 25, and the shack was freely accessible to all who wished to enter.

The lack of forensic evidence connecting Larry to the killing is also noteworthy. The forensic pathologist stated Tutt lost large amounts of blood, probably two to two and a half quarts, and significant bleeding would have occurred given the nature of the injuries. Indeed, the testimony revealed that blood had covered surrounding tree branches, and yet authorities did not find any of Tutt's blood on Larry's clothing or the backpack he constantly carried. Neither could the government establish the time of death. The FBI also did not find any trace evidence from Tutt (i.e. hairs or fibers) on Larry's possessions and did not find any of Larry's DNA on Tutt. Lastly, the FBI found no fingerprints on the

steak knife.

The most damning bit of evidence against Larry is, of course, Dawes's testimony -- he observed Henry (described as "the shorter [man]") and Larry (described as "the taller [man]") kicking and punching a man matching Tutt's description around dusk on April 25. (R. Vol. X at 166.) Despite the great distance from which Dawes made these observations and the inconsistencies in his statements regarding the number of individuals participating in the assault, we must assume his testimony is true and he did indeed see the Defendants hitting and kicking Tutt that evening. But while that fact incontrovertibly establishes battery of Tutt by the Defendants, it does not, without more, provide sufficient evidence to convict Larry of second-degree murder. Notably, Dawes never testified he saw a weapon of any sort, let alone a steak knife. Moreover, the exculpatory evidence regarding the physical state of Larry's right hand only two days after the killing must function into the equation and Larry only confessed to buying and drinking "ocean" with Tutt, hardly an admission to second-degree murder.

Larry's spontaneous statement to Agent Hall is insufficient to lift the government's case over the threshold of reasonable doubt. He told Hall, "I didn't stab him or I would have blood all over my jeans." (R. Vol. XI at 395 (quotations omitted).) We are somewhat baffled by the government's argument that this exculpatory statement is overt evidence of guilt. Even false exculpatory

statements (which the government did not prove this was) cannot be considered by the jury as direct evidence of guilt. See United States v. Davis, 437 F.3d 989, 996 (10th Cir.), *cert. denied,* 547 U.S. 1122 (2006). Viewed in the light most favorable to the government, Larry's statement is not sufficiently inculpatory, even when combined with drinking "ocean" and participation in the assault on Tutt, to establish guilt beyond a reasonable doubt.[5]

Moreover, Agent Hall admitted he did not believe Larry could have stabbed Tutt given the physical condition of his right hand at the time of the April 28 interview. He described the hand as extremely swollen, sutured, and bandaged and independently confirmed that Larry underwent hand surgery on April 10. Not only does this evidence cast some doubt on Dawes's testimony—he claimed he saw Larry hitting Tutt with his right hand—but it further erodes the already thin evidence in this record suggesting Larry might have killed Tutt.

Although the government is not required to present evidence which

---

[5] Even if, viewing the evidence in the light most favorable to the government, the jury could find that portions of Larry's exculpatory statements were false, we agree with the Second Circuit that:

> falsehoods told by a defendant in the hope of extricating himself from suspicious circumstances are insufficient proof on which to convict where other evidence of guilt is weak and the evidence before the court is as hospitable to an interpretation consistent with the defendant's innocence as it is to the Government's theory of guilt.

United States v. Johnson, 513 F.2d 819, 824 (2d Cir. 1975).

eliminates all possible hypotheses of innocence, "readily available inferences of innocence" must be factored into our determination of whether a reasonable jury could find a particular defendant guilty of the crime charged beyond a reasonable doubt. Maldonado v. Scully, 86 F.3d 32, 37 (2d Cir. 1996) (Oakes, J., dissenting). Suffice it to say that the evidence brought forth at trial, even when viewed in toto and in the light most favorable to the government, is insufficient to establish Larry's guilt beyond a reasonable doubt.

A comparison of the evidence against Larry with that presented in United States v. Vallo, is instructive. 238 F.3d 1242 (10th Cir. 2001). In that case, we held the evidence was sufficient to support the defendants' (a mother for aiding and abetting and her boyfriend as a principal) second-degree murder convictions for the death of an infant. Id. at 1247-49. Although the type and quantity of evidence adduced in Vallo is by no means the minimum required to convict for second-degree murder, it is nonetheless illustrative. The evidence indicated the defendants had repeatedly assaulted the child on the date of his death and in the past (the defendants, in fact, admitted to doing so), and the expert medical testimony established the infant died from a recent combination of shaking and blunt force trauma. The evidence presented in Vallo—clear admissions of assaulting an infant (something which is, in and of itself, sufficient to cause death) coupled with scientific evidence and consistent past behavior—was vastly stronger than the evidence the jury took under consideration in the instant case.

-22-

Unfortunately, there are few other reported federal decisions addressing the sufficiency of the evidence presented in second-degree murder trials. We have located, however, a factually analogous state court decision. In State v. White, 235 S.E.2d 55 (N.C. 1977), the North Carolina Supreme Court concluded there was insufficient evidence to support the defendant's second-degree murder conviction. Id. at 59. The jury heard evidence in the case that the victim had lived in a mobile home adjacent to a motel where the defendant resided, the defendant frequently visited the victim, the defendant was a black male and a black male was seen running away from the mobile home on the evening of the killing, there was blood found on the carpet of the defendant's motel room, and a knife similar to the murder weapon was found in the defendant's motel room. See id. at 56-58. In reversing the trial court's refusal to grant the defendant's motion for non-suit, the North Carolina Supreme Court reasoned:

> [t]he State has shown that the defendant was in the general vicinity of the deceased's home at the time of the murder and that he made several arguably contradictory statements during the course of the police investigation. It may even reasonably be inferred that the defendant was at the home of the deceased when the deceased came to her death, or shortly thereafter. Thus, the State has established that the defendant had an opportunity to commit the crime charged. Beyond that we must sail in a sea of conjecture and surmise. This we are not permitted to do.

Id. at 59 (internal citations and quotation marks omitted). This reasoning applies equally here.

The government, however, also relies upon an aiding and abetting theory.

-23-

Pursuant to 18 U.S.C. § 2(a), "[w]hoever . . . aids, abets, counsels, commands, induces or procures [the] commission [of a crime] is punishable as a principal." The federal aiding and abetting statute does not establish a separate crime but merely eliminates "the common law distinction between principal and accessory." United States v. Langston, 970 F.2d 692, 705-06 (10th Cir. 1992). Regardless, "one cannot aid and abet a completed crime." United States v. Ledezma, 26 F.3d 636, 642 (6th Cir. 1994). A conviction based upon an aiding and abetting theory, therefore, requires the government to prove:

> (1) that the defendant associated [himself] with a criminal venture; (2) that the defendant participated in the venture as something [he] wished to bring about; (3) that [he] sought by [his] actions to make it succeed; and, lastly, (4) that the proof establishes the commission of the offense by someone and the aiding and abetting by the defendant so charged.

United States v. Lee, 54 F.3d 1534, 1540 (10th Cir. 1995). "Although knowledge a crime is being committed is relevant, some showing of intent to further the criminal venture must be introduced at trial." United States v. Delgado-Uribe, 363 F.3d 1077, 1084 (10th Cir. 2004); see also United States v. Hanson, 41 F.3d 580, 582 (10th Cir. 1994) ("A defendant may not stumble into aiding and abetting liability by inadvertently helping another in a criminal scheme unknown to the defendant.").

The government's case is not salvaged by its aiding and abetting theory. Aiding and abetting requires a defendant to "willfully associate himself with the criminal venture and seek to make the venture succeed through some action of his

own." United States v. Leos-Quijada, 107 F.3d 786, 794 (10th Cir. 1997); see also United States v. Sarracino, 131 F.3d 943, 946 (10th Cir. 1997) (discussing the required elements of a conviction under an aiding and abetting theory). In other words, "[t]he aider must have the *mens rea* to bring about the result committed by the other principals." United States v. Cooley, 1 F.3d 985, 997 (10th Cir. 1993); see also United States v. Hatatley, 130 F.3d 1399, 1406 (10th Cir. 1997) (discussing aiding and abetting liability and differentiating it from principal liability). That being said, the government was required to prove Larry participated in the assault and battery of Tutt intending (or reasonably expecting) it would bring about his death. An unpredictable stabbing during the assault (and certainly not later) would not satisfy that requirement. No evidence was presented from which a rational jury could find Larry participated with the knowledge or reasonable expectation the assault would be fatal. Because aiding and abetting requires specific intent, United States v. Lambert, 995 F.2d 1006, 1008 (10th Cir. 1993), the act of assaulting Tutt, standing alone, is insufficient. At the very least, the government was required to show Larry knew or should have known a dangerous weapon would be employed such that the jury could infer he appreciated the risk of mortal injury and participated in the assault nonetheless. But no such evidence, circumstantial or direct, was adduced. Consequently, there was insufficient evidence from which the jury could find Larry aided and abetted Tutt's murder.

C.    Henry Woody

Henry claims Hayes's statements to Agent Hall regarding Defendants' propensity toward violence and talking about killing people when drinking were erroneously admitted.  He argues Hayes's statements were not relevant (Fed. R. Evid. 401), were unduly prejudicial (Fed. R. Evid. 403), and for the first time, almost as an afterthought, argues the statement is inadmissible as evidence of Henry's character (Fed. R. Evid. 404(a)).  Because the statements were originally intended to be introduced as substantive evidence, but actually came in as impeachment evidence, we separately address each context.

1.    Statements as Substantive Evidence

When the government attempted to introduce Hayes's statements to Agent Hall as substantive evidence during Hayes's direct examination, Henry objected on the basis of Rules 401 and 403.  "A district court has broad discretion . . . and will be reversed only on a showing . . . . it [made] a clear error of judgment, exceed[ed] the bounds of permissible choice, or when its decision is arbitrary, capricious or whimsical, or results in a manifestly unreasonable judgment." United States v. Nickl, 427 F.3d 1286, 1300 (10th Cir. 2005) (quotations and citation omitted).

Rule 401 of the Federal Rules of Evidence defines relevant evidence as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be

without the evidence." Henry claims Hayes's statements were irrelevant because (1) there was no foundation for Hayes's knowledge of Henry's conduct while drinking or angry, (2) there was no evidence the Defendants were angry the night of the murder, and (3) general threats directed at no one in particular are not probative of intent to kill a particular person. We easily reject the Rule 401 arguments.

As to a lack of foundation, Hayes testified he knew Larry better than Henry, but that does not negate personal knowledge of Henry's behavior. Hayes admitted he was interviewed by Agent Hall and clearly stated his acquaintance with both Defendants as well as his personal knowledge of Larry's tendency to hit people when angry. Similarly, the lack of direct evidence that the Defendants were angry the night of the murder is not fatal. The jury could reasonably infer anger from their assault on Mr. Tutt.

The government concedes a defendant's generic threats to people other than the victim are generally inadmissible to show the defendant was predisposed to murder the victim. See People v. Williams, 407 N.E.2d 608, 613 (Ill. App. Ct. 1980); see also Sikes v. State, 252 So.2d 258, 260-61 (Fla. Dist. App. Ct. 1971); State v. Faust, 118 S.E.2d 769, 772 (N.C. 1961). However, it argues the statements at issue were relevant because they prove motive for the unpremeditated murder of Tutt, stating: "In this case, the United States offered the evidence to show that the Woody brothers become violent and angry while

drinking.  The evidence made it more probable that the Woody brothers attacked Tutt while drunk and angry, without any premeditation or any cognizable motive."  (Appellee's Br. at 15.)  Apparently, the government maintains if the jury believed Hayes's statements to Hall about the Defendants' violent behavior and threats of murder, it could infer the assault escalated into murder.  Given this explanation, the court could reasonably conclude the evidence was relevant, a relatively low hurdle.

Henry's counsel also objected to the admission of the evidence with a very general objection under Rule 403.  Relevant evidence is excluded under Rule 403 if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R . Evid. 403.  "Unfair prejudice in the Rule 403 context 'means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  See United States v. Tan, 254 F.3d 1204, 1211 (10th Cir. 2001) (quoting Fed. R. Evid. 403 advisory committee's note.)

We find the Seventh Circuit's discussion of motive in the context of Rule 404(b) instructive.  In United States v. Cunningham, the court noted inadmissible character evidence (*i.e.*, propensity) and evidence of motive can "overlap." 103 F.3d 553, 556 (7th Cir. 1996).  "They . . . overlap when the crime is motivated by a taste for engaging in that crime or a compulsion to engage in it (an 'addiction'),

rather than by a desire for pecuniary gain or for some other advantage to which the crime is instrumental . . . ." Id. The more "overlap" there is in a given case, the greater the danger a jury will misuse the evidence, even when given a limiting instruction. In Henry's case, the overlap is complete.

In opening argument, the government explained its theory of the case as follows:

> This case is almost without a motive. It's a fight. Kenneth Tutt got beaten. You say what was the motive? The motive you may infer from the evidence and the facts that you get, that Mr. Tutt had recently got paid, he had money, and he having money would be able to supply, with that money, the alcohol that these two defendants and Kenneth were drinking. He was a source for the procurement of alcohol. And when he didn't continue to procure it, he got beaten, punished, stabbed and killed.

(R. Vol. VIII at 128.) Hayes's statements regarding the Defendant' propensity toward violence when drinking was the only evidence supporting this theory. There was testimony Tutt gave Larry some money to buy "ocean," but no evidence Tutt had just been paid, no evidence Tutt and either Defendant argued over money, no evidence linking the murder to robbery, and no money found on Henry or Larry. Consequently, only the Defendants' violent and threatening characters lend credence to the government's theory of Tutt's murder. As a result, the "motive" evidence is nothing more than evidence of Henry's general propensity toward violence when drinking and angry. "Showing that a man is generally bad has never been under our system allowable. The defendant has a

-29-

right to be tried on the truth of the specific charge contained in the indictment." United States v. Gilliland, 586 F.2d 1384, 1389 (10th Cir. 1978). We conclude the district court erred in allowing evidence of Henry's violent character.

The government argues that if there was error, it was harmless because no actual character "evidence" was adduced through Hayes's continued denial he made the statement. The statements were presented to the jury solely through the government's questions, which are not evidence, as the court so instructed. If this were the only introduction of Hayes's statements, we might agree. However, the statements were reintroduced and affirmed by Hall only a short time later.

2.    Statements as Impeachment Evidence

Henry argues the district court improperly allowed the government to introduce inadmissible substantive evidence under the guise of impeachment. Although Henry did object to the use of the statement as improper impeachment, he did so only because he claimed Hayes's testimony at trial was not inconsistent, an objection correctly overruled by the court.[6]

_____

[6] Henry's counsel objected to the admission of impeachment evidence under Rule 613 arguing that because Hayes testified he could not remember making the statements, the report was not inconsistent with Hayes's testimony. The court overruled the objection stating:

His testimony was quite mixed with "I don't remember" or very affirmative "no's" when he was very specifically asked, Did you say this, did you do this? . . . . And I think that there was a great deal or potential great deal of inconsistency in the statements as the witness is going to relate them.

-30-

Rule 613(b) of the Federal Rules of Evidence provides:

**(b) Extrinsic evidence of prior inconsistent statement of witness.**
Extrinsic evidence of a prior inconsistent statement by a witness is
not admissible unless the witness is afforded an opportunity to
explain or deny the same and the opposite party is afforded an
opportunity to interrogate the witness thereon, or the interests of
justice otherwise require.  This provision does not apply to
admissions of a party-opponent as defined in rule 801(d)(2).

Rule 607 states: "The credibility of a witness may be attacked by any party,
including the party calling the witness."  Read together, Rules 607 and 613(b)
allow a party to impeach its own witness with extrinsic evidence of prior
inconsistent statements.  See United States v. Carter, 973 F.2d 1509, 1512 (10th
Cir. 1992).  Before such evidence is allowed, however, it must meet certain
requirements.  First, under Rule 613(b), the witness must be confronted with the
statement and afforded an opportunity to explain or deny it.  The record clearly
demonstrates this requirement was met.

There are further restrictions, however, to impeachment evidence.  While
not specifically incorporated in Rule 607 or Rule 613(b), when the contradiction

---

(R. Vol. XI at 400.)  Henry wisely does not raise this argument on appeal.  See
United States v. Rogers, 549 F.2d 490, 496 (8th Cir. 1976) ("A statement's
inconsistency may be determined from the circumstances and is not limited to
cases in which diametrically opposite assertions have been made.  Thus,
inconsistencies may be found in changes in position; they may be implied through
silence; and they may also be found in denial of recollection."); United States v.
Insana, 423 F.2d 1165, 1169-70 (2d Cir. 1970) ("The conclusion that prior
testimony inconsistent with a present lack of memory may be admissible as a
contradiction is not a novel one.").

relates to a "collateral matter," impeachment may be received only through the testimony of the witness to be impeached. United States v. Durham, 470 F.3d 727, 732 (8th Cir. 2006). Evidence extrinsic to that witness's testimony is inadmissible to prove a witness's trial testimony is contradicted by a previous statement. The application of the collateral matter rule is an extension of Rule 403, which also remains controlling in admitting impeachment evidence. Id.; see also United States v. Buffalo, 358 F.3d 519, 524-25 (8th Cir. 2004).

In addition, upon admission of prior inconsistent statements, "[i]t is well settled that contradictory statements introduced for the purpose of impeachment are not admissible as substantive evidence." United States v. Neal, 452 F.2d 1085, 1086 (10th Cir. 1971); see also Carter, 973 F.2d at 1512 ("A witness' prior statements are admissible only to impeach or discredit the witness and are not competent substantive evidence of the facts to which the former statements relate.") (quotations omitted).[7] Henry maintains Hayes's

_____

[7] Henry also argues, although the evidence was not admissible for substantive purposes, the government's primary purpose was to place the evidence before the jury for just that purpose. "Every circuit has said evidence that is inadmissible for substantive purposes may not be purposely introduced under the pretense of impeachment." United States v. Peterman, 841 F.2d 1474, 1479 n.3 (10th Cir. 1988) (listing cases); see also Carter, 973 F.2d at 1512 ("The government may not introduce evidence of prior statements under the guise of impeachment for the *primary* purpose of placing before the jury substantive evidence which is not otherwise admissible.") (quotations omitted). A party may not call a witness knowing the witness will not provide substantive testimony but only to impeach the witness with damaging prior statements that would, otherwise, be inadmissible. However, the determination to admit or exclude

-32-

statements about the Defendants' conduct when drinking fail each of these tests:

---

impeachment evidence pivots on the intentions of counsel. See Peterman, 841 F.2d at 1480 (factual findings by the trial court supported its conclusion the prosecutor did not call witness with the primary purpose of introducing evidence of his prior conviction.).  In United States v. Clifton, the defendant challenged the admission of impeachment testimony that would have been inadmissible hearsay. 406 F.3d 1173 (10th Cir. 2005).  In his concurrence, Judge Hartz observed:

> The *Peterman* rule strikes me as passing strange.  Why should the admissibility of evidence depend on the state of mind of the attorney proffering the evidence?  To be sure, the prosecutor's motive plays a limited role in some legal issues . . .  But it is hard to find support in the Federal Rules of Evidence for considering attorney intent as a factor in determining admissibility.  Instead, as one would expect, we look at factors relating to the probative and unfairly prejudicial impact of the evidence.  Of course, the more such prejudicial impact exceeds the probative value, the greater the likelihood that the prosecutor's motive in proffering the evidence was impure.  But when the unfairly prejudicial impact substantially predominates, we should not admit the evidence just because the prosecutor's thoughts are pure, nor should we exclude evidence on the ground of prosecutorial obliquity when the probative value is not substantially outweighed by the danger of unfair prejudice.  There is significant authority for my view.  *See United States v. Ince,* 21 F.3d 576, 580 (4th Cir. 1994) ("Federal evidence law does *not* ask the judge . . . to crawl inside the prosecutor's head to divine his or her true motivation."); *United States v. Buffalo,* 358 F.3d 519 (8th Cir. 2004); 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 607.02[2][b] (2d ed.2004); 27 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure: Evidence* § 6093 (1990) (recommending Rule 403 approach to propriety of admitting impeachment evidence, although suggesting that it may be useful to incorporate Rule 403 explicitly in Rule 607).  I trust that we will have occasion to revisit this issue.

Id., at 1185-86 (Hartz, J., concurring).  We agree, but need not reach the issue in this case because we can resolve the issue under a Rule 403 analysis.

(1) Hayes's statement concerned an irrelevant, collateral issue; (2) the evidence was highly prejudicial and its probative value regarding Hayes's credibility was negligible; and (3) the statements were used as substantive evidence.

a.    *Collateral Matter*

The collateral matter rule is a subset of a court's authority to exclude impeachment evidence under Rule 403. Walker, 930 F.2d at 791. "A matter has been held to be collateral if it could not have been introduced in evidence for any purpose independent of the impeachment." Id.; see also United States v. Rosario Fuentes, 231 F.3d 700, 707 (10th Cir. 2000) ("Because the truth-seeking function of the court would be impaired, and because the questions [the witness] refused to answer were germane to issues in the indictment, the testimony was not collateral."); Fryar v. Curtis, 485 F.3d 179, 184 (1st Cir. 2007) ("A matter is considered collateral if the matter itself is not relevant in the litigation to establish a fact of consequence, i.e., not relevant for a purpose other than mere contradiction of the in-court testimony of the witness. Stated another way, extrinsic evidence to disprove a fact testified to by a witness is admissible when it satisfies the Rule 403 balancing test and is not barred by any other rule of evidence."). The danger of allowing impeachment via a collateral matter is that when the fact to be impeached is not material, "the trier of fact may become confused by the attention directed at an unimportant fact. As a result, the trier of fact may attach undue importance to extraneous matters." 27 CHARLES ALAN

WRIGHT & VICTOR JAMES GOLD, FEDERAL PRACTICE AND PROCEDURE § 6096.

In Walker, the defendant was charged with two counts of illegal possession of a firearm. One of the counts stemmed from an incident in which Walker drove to Hyle's house, a man he suspected was dating his ex-wife. Hyle testified Walker shot at him and he returned fire. To impeach this testimony, Walker attempted to introduce evidence of the investigating officer's testimony in a prior hearing that Hyle told the officer Walker did not shoot first. The trial court allowed Walker to put the officer on the stand. However, when the officer did not testify he was told Hyle shot first, the court precluded further questioning of the witness. We upheld the trial court's decision, reasoning:

> There is no dispute that the issue of whether at some prior time Mr. Hyle stated he had fired first was relevant only for impeachment purposes. The indictment charged only the status offense of possession of a weapon and did not include assault charges. Who fired first was irrelevant to the issue of guilt. The defense effort to impeach Mr. Hyle on the issue of who fired first was therefore a collateral issue . . . . [I]mpeachment on a collateral matter [is] properly excluded in the discretion of the trial court.

930 F.2d at 791-92 (quotation omitted).

"That evidence concerns a collateral matter does not, of course, necessarily render it inadmissible. To the contrary, such evidence is admissible provided that it is 'relevant' and not otherwise prescribed by law or rule." United States v. Fonseca, 435 F.3d 369, 374-75 (D.C. Cir. 2006). Under Rule 401, evidence that contradicts a witness's trial testimony, even on a collateral subject, may be

relevant "because it would undermine [his] credibility as a witness regarding facts of consequence."  Id. at 375; see also United States v. Marino, 277 F.3d 11, 24 (1st Cir. 2002) ("Nevertheless, extrinsic evidence to disprove a fact testified to by a witness may be admissible if the trial judge deems that it satisfies the Rule 403 balancing test *and* it is not excluded by another rule.").  Therefore, we proceed to review the admission of Hayes's statements under a Rule 403 analysis.

b.    *Rule 403*

Rule 403 requires the court to balance the relative probative and prejudicial value of evidence.  This "serves to prevent a party from calling a witness, knowing him or her to be adverse, merely to make an end-run around the rule against hearsay by impeaching the witness with a prior inconsistent statement that the jury would not otherwise have been allowed to hear."  Durham, 470 F.3d at 732 (quotations omitted).  The applicable inquiry is whether, under Rule 403, "[t]he prior statements are inculpatory to [the defendant] if considered to be true." United States v. Logan, 121 F.3d 1172, 1175 (8th Cir. 1997).  If so, "to be admissible, their value for impeachment purposes -- or portraying or exposing [the witness] as a person who is unworthy of belief -- has to outweigh the danger of unfair prejudice and jury confusion that those prior statements may create if admitted."  Id.  The value of impeachment, then, is determined after an examination of the entire testimony of the witness to be impeached.

Hayes's testimony established his age, 34; the location and lack of security

of his residence; his acquaintance with the Defendants; a birthday party on August 25, 2004; the presence of his father and his father's companion on the 25th in the shack; he did not see the Defendants on the 25th or 26th; he was interviewed by Agent Hall and another officer; Henry stutters when he gets nervous;[8] and Hayes did not remember or did not think he made certain statements to Agent Hall. In other words, he did not testify to much of anything demonstrating Henry's guilt. Instead, any impeachment was most probative of what Hayes denied or could not remember at trial. Thus, the probative value of the impeachment, challenging his credibility to undermine the subject matter of his testimony, was negligible. Moreover, Hayes's credibility was already attacked by the court when it admonished him during his direct examination.

On the other hand, the admission of Henry's alleged behavior when drinking or angry was highly prejudicial. No other witness testified to Henry's propensity for violence when drinking or his tendency to make death threats when angry. We recognize "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules 'is an extraordinary remedy and should be used sparingly.'" Tan, 254 F.3d at 1211 (quoting United States v. Rodriguez, 192 F.3d 946, 949 (10th Cir. 1999)). However, "the danger of confusion which arises from

---

[8] Originally, Hayes stated he did not remember telling Hall that Henry stutters when Henry gets nervous. However, when asked directly if "Henry Wood, when he gets nervous, does he stutter?" Hayes answered "Yes." (R. Vol. XI at 380.)

the introduction of testimony under circumstances such as are presented here is so great as to upset the balance and to warrant continuation of the rule of exclusion." United States v. Ince, 21 F.3d 576, 580 (4th Cir. 1994) (quotations omitted). Thus, the unfair prejudice of Hayes's out-of-court statement substantially outweighed the probative value and were inadmissible to impeach Hayes under Rule 403.

c.    *Substantive Use of Impeachment*

Because Hayes's descriptions of the Defendants' behavior was not admitted for its truth, the jury could not properly consider them evidence of Henry's motivation to kill or of his guilt.  United States v. Magleby, 241 F.3d 1306, 1313 n.4 (10th Cir. 2001).  Henry maintains, despite the court's limiting instruction to the jury, this is exactly how the government urged the jury to use the information in reaching a verdict.  We must agree.

In closing, the government stated, "In the course of the impeachment [of Hayes], later through Agent Hall, it was developed impeachment style on Hayes that he told Agent Hall when these two defendants get mad, they talk about killing people and [when] they drink, they threaten people.  This is for you to decide because you're the best people to do this."  (R. Vol. XII at 480.)  In other words, the government invited the jury to use the impeachment testimony not to judge Hayes's credibility, but to believe his statements to Hall and determine Defendants' guilt from an inference they are violent characters who will murder

-38-

when drinking and angry.

Indeed, the government continues to use the impeachment evidence for substantive purposes on appeal. In its harmless error argument, the government posits the evidence against Henry was sufficient, in part, because the evidence showed "Henry Woody told Paul Hayes not to say anything to the police about the murder." (Appellee's Br. at 26.) However, that "fact" was introduced solely through the impeachment testimony of Agent Hall, and therefore cannot be considered as evidence of Henry's guilt.

We sympathize with the district court given the lack of assistance from counsel for all parties in appropriately defining the evidentiary issues. However, despite our deferential review of the court's evidentiary decisions, we conclude the admission of Hayes's statement was error. The probative value was far outweighed by the danger of unfair prejudice and jury confusion. Given the facts before us, the admission of Hayes's statements regarding Henry's propensity toward violence "placed the underlying fairness of the entire trial in doubt." See Rosario Fuentes, 231 F.3d at 708.

As discussed in Larry's appeal, the evidence supporting Henry and Larry's guilt overlapped and, as a whole, was weak at best. In addition, the possibility the jury used these statements as substantive evidence cannot be ignored.

> The introduction of such testimony, even where limited to impeachment, necessarily increases the possibility that a defendant may be convicted on the basis of unsworn evidence, for despite

proper instructions to the jury, it is often difficult for jurors to distinguish between impeachment and substantive evidence . . . . When the prosecution attempts to introduce a prior inconsistent statement to impeach its own witness, the statement's likely prejudicial impact often substantially outweighs its probative value for impeachment purposes because the jury may ignore the judge's limiting instructions and consider the "impeachment" testimony for substantive purposes.

Ince, 21 F.3d at 580-81 (quotations omitted); see also United States v. Beno, 324 F.2d 582, 587 (2d Cir. 1963) ("By attempting to show [the defendant] was the sort of man likely to be the perpetrator of crime, the prosecution denied him a fair opportunity to defend against the particular crime charged, for this sort of evidence weighs too heavily with the jury and makes impossible the dispassionate approach necessary if justice is to be achieved.").  Given the paucity of the government's evidence (including the lack of forensic evidence against Henry), the small probative value of impeaching Hayes, the government's suggestion in closing that the jury use the statements for substantive purposes (coupled with an unsupported comment that Hayes was afraid of the Defendants), we must conclude the admission of Henry's propensity toward violence requires reversal

and a new trial. Therefore, the remainder of Henry's claims are moot.

## Conclusion

Because the government failed to present sufficient evidence to find Larry

Woody guilty beyond a reasonable doubt, his conviction is **REVERSED**.[9]  The

district court's erroneous admission of evidence showing Henry Woody's general

propensity toward violent behavior placed the underlying fairness of the entire

trial in doubt.  His conviction is **REVERSED** and his case **REMANDED** for

further proceedings consistent with this order.

In 06-2100, *United States v. Henry Peter Woody Jr.*, Judge McWilliams

dissents.

---

[9]  By Order dated August 3, 2007, we reversed the conviction of Larry Woody and remanded to the district court to enter a judgment of acquittal.