**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
———————————————————

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ARAPAHO JAMES OLDMAN,

    Defendant - Appellant.

No. 19-8023
(D.C. No. 2:18-CR-00020-SWS-1)
(D. Wyo.)

———————————————————

**ORDER**
———————————————————

Before **BRISCOE**, **MURPHY**, and **MATHESON**, Circuit Judges.
———————————————————

This matter is before us on Appellant's *Petition for Panel Rehearing* ("Petition").

Pursuant to Fed. R. App. P. 40, the Petition is granted in part to the extent of the

modifications on pages 7, 24, and 27-29 of the attached revised opinion. The court's

October 20, 2020 opinion is withdrawn and replaced by the attached revised opinion

effective *nunc pro tunc* to the date the original opinion was filed. Because the panel's

decision to partially grant rehearing does not affect the outcome of this appeal, Appellant

may not file a second or successive rehearing petition. *See* 10th Cir. R. 40.3.


Entered for the Court


CHRISTOPHER M. WOLPERT, Clerk

FILED
United States Court of Appeals
Tenth Circuit

October 20, 2020

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ARAPAHO JAMES OLDMAN,

    Defendant - Appellant.

No. 19-8023

_____

**Appeal from the United States District Court
for the District of Wyoming
(D.C. No. 2:18-CR-00020-SWS-1)**
_____

Ann Marie Taliaferro, Brown Bradshaw & Moffat, P.L.P., Salt Lake City, Utah, for Defendant – Appellant.

Thomas Andrew Szott, Assistant U.S. Attorney, (Mark A. Klaassen, U.S. Attorney), U.S. Department of Justice, Cheyenne, Wyoming, for Plaintiff – Appellee.
_____

Before **BRISCOE**, **MURPHY**, and **MATHESON**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

    Arapaho James Oldman and Matthew Whiteplume severely beat Charles Dodge III. One of them cut his throat. Mr. Dodge died from blunt-force trauma and/or sharp-force injuries.

A grand jury charged Mr. Oldman with first-degree murder as both a principal and an aider and abettor.  At trial, the district court refused his request for a lesser-included offense instruction on assault resulting in serious bodily injury ("ARISBI") under 18 U.S.C. § 113(a)(6).  The jury convicted Mr. Oldman.

On appeal, Mr. Oldman argues the court erred by refusing to give the ARISBI instruction.  He also contends the court erred when it "mishandled" graphic photos of Mr. Dodge's body, allowed a defense witness to invoke his Fifth Amendment privilege, communicated ex parte with a juror, and misapplied the spousal privilege.  Finally, he claims his trial counsel was ineffective.  Exercising jurisdiction under 28 U.S.C. § 1291, we reject these arguments and affirm.

## I.  BACKGROUND

### A.  *Factual Background*

The night before Thanksgiving in 2017, Mr. Oldman, Mr. Whiteplume, Mr. Dodge, Monty Tabaho, and Bernadette Brown were partying in the basement of Mr. Whiteplume's aunt and uncle's house.  At some point, Mr. Oldman and Mr. Whiteplume began beating Mr. Dodge.[1]

A week later, police were called to the house to investigate a smell in the basement.  They found Mr. Dodge's dead body in a crawlspace.  An autopsy showed broken facial bones, teeth, and ribs; a broken arm and leg; more than a dozen stab

---

[1] Others also attended the party, but the record is unclear as to whether anyone other than those listed above was in the basement during the attack on Mr. Dodge.

2

wounds; and blunt-force trauma to Mr. Dodge's legs, torso, face, and head, including subdural hemorrhage. ROA, Vol. 3 at 929-32, 976.

Mr. Dodge's face had been disfigured. Dental records established his identity. Investigators found Mr. Whiteplume's and Mr. Dodge's DNA on a bloodstained sweatshirt found outside the crawlspace.

The superseding indictment charged Mr. Oldman and Mr. Whiteplume with first-degree murder as principals and as aiders and abettors in violation of 18 U.S.C. §§ 2, 1111, and 1153 (Count 1). It also charged Mr. Tabaho and Jori Lamebull as accessories after the fact in violation of 18 U.S.C. §§ 3 and 1153 (Counts 2 and 3).

Mr. Whiteplume pled guilty to aiding and abetting second-degree murder. Mr. Tabaho and Ms. Lamebull each pled guilty to being an accessory after the fact to second-degree murder. Only Mr. Oldman went to trial.

## B. *Trial Evidence*

At trial, the prosecution presented witnesses to the attack, investigative and expert witnesses, and witnesses who spoke with Mr. Oldman and Mr. Whiteplume after Mr. Dodge's death. The defense presented an expert witness and an FBI agent who had spoken with Mr. Tabaho.

1. **Prosecution**[2]

    a. *Attack witnesses*

        i. <u>Bernadette Brown</u>

Ms. Brown described the night of the attack as follows. She, Mr. Oldman, Mr. Whiteplume, Mr. Dodge, and Mr. Tabaho, were in the basement drinking, smoking marijuana, and (except Mr. Dodge) using methamphetamines.

After Mr. Dodge refused Mr. Oldman's request for a bottle of alcohol, Mr. Oldman punched him. ROA, Vol. 3 at 531. They fought. Mr. Oldman knocked Mr. Dodge to the ground and punched and kicked him. Mr. Tabaho gave Mr. Oldman a nearby wrench. *Id.* at 570. He hit Mr. Dodge on the head with the wrench twice. *Id.* at 570-71. Mr. Oldman then asked Mr. Tabaho for a crowbar from upstairs. *Id.* at 532, 571-573. He used it to hit Mr. Dodge in the face four times. *Id.*

Mr. Whiteplume kicked Mr. Dodge at least twice while he was on the ground. *Id.* at 558. Mr. Whiteplume proposed they cut Mr. Dodge's throat. *Id.* at 557. Mr. Oldman and Mr. Whiteplume put Mr. Dodge—who was barely breathing—in the crawlspace. *Id.* at 534. At Mr. Oldman's suggestion, they unplugged the basement freezer to mask any smell "in case he rots." *Id.* at 534-35. They left Ms. Brown in the

---

[2] We discuss only those witnesses whose testimony is relevant to this appeal.

basement with Mr. Dodge. She could hear him "gurgling," but his throat had not been cut. *Id.* at 533, 535. She left early in the morning while it was still dark.[3]

A week later, Mr. Whiteplume told her he "had to slice [Mr. Dodge's] throat." *Id.* at 539.

### ii. Matthew Whiteplume

Mr. Whiteplume testified as follows pursuant to his plea agreement. He said that he was upstairs making a drink when Mr. Oldman started beating Mr. Dodge. When he returned to the basement, he saw a belt around Mr. Dodge's neck and Mr. Oldman grabbing Mr. Dodge's hair and punching him. *Id.* at 595.

After Mr. Oldman told him that Mr. Dodge had participated in a group that had jumped Mr. Whiteplume a few weeks before, resulting in his hospitalization, Mr. Whiteplume began punching Mr. Dodge. *Id.* at 595-96.

Mr. Oldman said several times that Mr. Dodge was "going to die tonight." *Id.* at 606. Mr. Whiteplume saw that Mr. Oldman had a knife, and he went upstairs to "get help." *Id.* at 601. When nobody would help, he went back to the basement. He saw Mr. Oldman hit Mr. Dodge twice with "a weapon." *Id.* at 608. Mr. Dodge tried to stand up but could not. *Id.* at 610. Mr. Whiteplume put Mr. Dodge in the crawlspace and shut the door. *Id.* at 611. He then went upstairs to rejoin the party.

---

[3] Ms. Brown's testimony is inconsistent as to whether Mr. Whiteplume and Mr. Oldman were still in the house when she left. During direct examination, she testified they were upstairs when she left. *Id.* at 534. During cross-examination, she agreed they had left the house while she was in the basement. *Id.* at 556.

Later that night, Mr. Whiteplume and Mr. Oldman returned to the basement. They saw Mr. Dodge trying to get out of the crawlspace. Mr. Oldman grabbed Mr. Dodge by the hair. Mr. Whiteplume refused Mr. Oldman's order to kill Mr. Dodge.

Mr. Oldman told Mr. Whiteplume to look away or go upstairs. Mr. Whiteplume walked to the stairs but turned back and saw Mr. Oldman "make four or five tugging motions" at Mr. Dodge's throat. *Id.* Mr. Dodge "died right there." *Id.* at 614.

Later, Mr. Whiteplume, Mr. Tabaho, and Ms. Lamebull wrapped the body and returned it to the crawlspace.

b. *Investigative and expert witnesses*

i. Jaclyn Garfinkle

FBI analyst Jaclyn Garfinkle testified that Mr. Whiteplume's and Mr. Dodge's DNA were found on the "inside collar and the underarm area of [a] sweatshirt" near the crawlspace. *Id.* at 799.

ii. Mark Stratmoen

Mark Stratmoen, the Fremont County, Wyoming coroner, testified that he found Mr. Dodge's body in the crawlspace. He said "the crawlspaces beneath a house generally average about 40 degrees as a standard" at that time of year. *Id.* at 467. He also reported that, when Mr. Dodge's body was found, there was "[s]ome extremely spoiled meat" in the freezer. *Id.* at 440.

### iii. Dr. Michael Burson

Dr. Michael Burson, a forensic pathologist, conducted the autopsy of Mr. Dodge.[4] He testified that discerning the cause of Mr. Dodge's death was "complicated . . . because he had so many various types of injuries." *Id.* at 929. Dr. Burson "observed severe blunt-force trauma to [Mr. Dodge's] face and his extremities" and "almost innumerable sharp-force injuries." *Id.* He explained that "the blunt force alone could have resulted in [Mr. Dodge's] death in time had he not had the other injuries as well," but that "there were also significant sharp-force injuries." *Id.* at 930-31. He also testified that, even if Mr. Dodge's throat had not been cut, his wounds from the beating would have killed him "[a]t most" in a couple hours without medical treatment. *Id.* at 969-70.

At trial, Dr. Burson relied on autopsy photos of Mr. Dodge's body and head to explain Mr. Dodge's injuries. He used them to explain how he could differentiate between antemortem and postmortem injuries, and how he could tell which injuries stemmed from blunt or sharp force. Some of the sharp-force neck injuries reflected in the photos occurred while Mr. Dodge was alive, and "definitely would have resulted in death." *Id.* at 934-35.

---

[4] Dr. Burson testified that he "belong[s] to a small group of forensic pathologists who" perform autopsies on behalf of county coroners in Colorado and Wyoming. *Id.* at 917-18.

7

c. *Postmortem Witnesses*

i. Bridget Oldman

Bridget Oldman said Mr. Oldman and she were, "like . . . fifth cousins." *Id.* at 674. She testified that, days after Mr. Dodge's death, she asked Mr. Oldman "if he did it." *Id.* at 692. He responded, "No, but I helped." *Id.*

ii. Irene Dewey

Mr. Oldman's sister, Irene Dewey, testified that she picked up Mr. Oldman from the house the morning after the party. As they were leaving, Mr. Oldman yelled into the house, "Let him go after I leave." *Id.* at 830.

iii. Donna Oldman

Donna Oldman, Mr. Oldman's ex-wife, said Mr. Oldman called her within days of Mr. Dodge's death and told her he needed help because he "did the worst possible." *Id.* at 897.

iv. Jessica Guffey

Jessica Guffey, Mr. Oldman's girlfriend at the time of trial, testified that days after Mr. Dodge's death, Mr. Oldman told her, "Babe . . . I'm a killer. I'm a killer." *Id.* at 905, 912. She said Mr. Oldman brought her to the basement where the attack occurred, lifted the crawlspace door, spat inside the crawlspace, and said, "You stink." *Id.* at 915-16.

2. **Defense**

   a. *Expert witness – Brian McVicker*

   Brian McVicker, a "forensic footwear and tire examiner at the FBI Laboratory," testified that various footprints left in the basement did not match those of shoes belonging to Mr. Oldman, Mr. Whiteplume, or Mr. Dodge. *Id.* at 1009, 1035.

   b. *Postmortem witness – Christine Coble*

   FBI agent Christine Coble testified that, after Mr. Dodge's death, she met with Mr. Tabaho. Mr. Tabaho told her that he and Mr. Whiteplume returned to the basement and attempted to disfigure Mr. Dodge's body.[5]

## C. *Jury Instructions*

At the end of the trial, Mr. Oldman objected to the district court's refusal to give a lesser-included offense instruction of ARISBI. The court overruled the objection and instructed the jury only on first-degree murder, second-degree murder, and aiding and abetting. It said that, under *Schmuck v. United States*, 489 U.S. 705, 716 (1989), ARISBI is not a lesser-included offense of first-degree murder. In *Schmuck*, the Supreme Court adopted the "elements test," under which "one offense is not [a lesser-included offense of] another unless the elements of the lesser offense are a subset of the elements of the charged offense." 489 U.S. at 716. Applying this test, the district court relied on *United*

---

[5] As discussed below, Mr. Oldman also called Mr. Tabaho as a witness, but Mr. Tabaho invoked his Fifth Amendment privilege against self-incrimination and did not testify before the jury.

9

*States v. Cavanaugh*, 948 F.2d 405, 407 (8th Cir. 1991), in which the Eighth Circuit held

that the ARISBI elements are not a subset of the elements of murder.

### D. *Conviction*

The jury convicted Mr. Oldman of first-degree murder. The verdict form did not

specify whether it found him liable as a principal or as an aider and abettor. The district

court had instructed the jury on both. The court entered a final judgment and sentenced

Mr. Oldman to life in prison.

## II. **DISCUSSION**

On appeal, Mr. Oldman contends the district court erred when it (A) declined to

give an ARISBI instruction, (B) "mishandled" graphic photos of Mr. Dodge's body, and

(C) allowed Mr. Tabaho to invoke his Fifth Amendment privilege. He also argues (D)

the district court engaged in improper ex parte communications with a juror and

misapplied the spousal privilege, and that his counsel was ineffective.

### A. *Lesser-Included Offense Instruction*

#### 1. **Standard of Review**

"We review the district court's decision [to deny a lesser-included offense

instruction] for an abuse of discretion." *United States v. Waugh*, 950 F.3d 665, 667 (10th

Cir. 2019). But "[i]f there is evidence to support a lesser included offense and [the]

defendant requests such a charge, the court has no discretion to refuse to give the

instruction." *United States v. Pacheco*, 884 F.3d 1031, 1047 (10th Cir. 2018) (quotations

omitted). "Whether an offense for which an instruction is sought actually qualifies as a

10

lesser included offense of the offense charged is a question of law that we review *de novo.*" *United States v. Duran*, 127 F.3d 911, 914 (10th Cir. 1997).

## 2. **Additional Legal Background**

### a. *Lesser-included offense requirements*

To receive a lesser-included offense instruction, the defendant must show:

> (1) "he properly requested the instruction,"
> (2) "the elements of the lesser offense are included in the elements of the greater offense,"
> (3) "the element differentiating the two offenses is in dispute," and
> (4) "the jury is able to rationally acquit the defendant of the greater offense and convict on the lesser offense."

*Waugh*, 950 F.3d at 667. The court must provide the requested instruction only if "all four of these factors have been satisfied." *Duran*, 127 F.3d at 915.

#### i. Proper request

A "proper request" for a lesser-included offense instruction must identify the specific lesser-included offense. *United States v. Bruce*, 458 F.3d 1157, 1163 (10th Cir. 2006).

#### ii. Elements of lesser offense included in greater offense

This is the *Schmuck* "elements" test, which stems from Federal Rule of Criminal Procedure 31(c)(1). That rule provides that "[a] defendant may be found guilty of . . . an offense necessarily included in the offense charged." Fed. R. Crim. P. 31(c)(1). Under *Schmuck*, "one offense is not 'necessarily included' in another unless the elements of the lesser offense are a subset of the elements of the charged offense." 489 U.S. at 716. "To

11

be a subset of the greater offense, the lesser offense must be such that it is impossible to commit the greater without first having committed the lesser." *United States v. Chanthadara*, 230 F.3d 1237, 1258 (10th Cir. 2000) (quotations and brackets omitted). "Accordingly, when the lesser offense requires an element not required for the greater offense, no instruction is to be given." *Id.* (quotations omitted).

### iii. Elements in dispute

The defendant must dispute the element differentiating the greater from the lesser offense. *See Waugh*, 950 F.3d at 667. For example, in *United States v. Brown*, 287 F.3d 965, 975, 977 (10th Cir. 2002), we held a defendant convicted of murder was entitled to an instruction on involuntary manslaughter because he disputed whether he acted recklessly (needed for murder) or negligently (needed for involuntary manslaughter).

### iv. Jury could acquit on the greater offense

A district court commits reversible error in denying a lesser-included offense instruction "[only] if we are 'convinced' a rational jury could convict on the lesser charge and acquit on the greater charge." *Pacheco*, 884 F.3d at 1048; *see also United States v. Moore*, 108 F.3d 270, 272 (10th Cir. 1997). A defendant who is charged with both the greater offense and aiding and abetting the greater offense is entitled to a lesser-included offense instruction only when a reasonable jury could acquit on both principal and aiding and abetting liability. *See United States v. Zamora*, 222 F.3d 756, 767 (10th Cir. 2000);

12

*see also United States v. Pluma*, 511 F. App'x 705, 710 (10th Cir. 2013) (unpublished).[6]

"In conducting this review, we must give full credence to defendant's testimony." *Brown*, 287 F.3d at 974 (quotations omitted).

        b.  *Principal and aider and abettor liability for murder*

Because the jury in this case was properly instructed on first-degree murder as a principal and as an aider and abettor, we consider both grounds for liability. *See United States v. Langston*, 970 F.2d 692, 706 (10th Cir. 1992) (holding that we may interpret a conviction as applying either principal or aider and abettor liability when the jury is properly instructed as to both).

        i.  <u>Principal liability</u>

"Murder is the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a); *see United States v. Currie*, 911 F.3d 1047, 1054 (10th Cir. 2018). For a first-degree murder conviction, the prosecution must show (1) the defendant caused the death of the victim, (2) with malice aforethought, and (3) with premeditation. *See United States v. Wood*, 207 F.3d 1222, 1228 (10th Cir. 2000); Tenth Circuit Criminal Pattern Jury Instruction 2.52 (Feb. 2018 update). The "malice [requirement] is not satisfied simply by killing with an intentional or reckless mental state; instead, malice

---

[6] Although not precedential, we find the reasoning of the unpublished decisions cited in this opinion instructive. *See* 10th Cir. R. 32.1 ("Unpublished decisions are not precedential, but may be cited for their persuasive value."); *see also* Fed. R. App. P. 32.1.

specifically requires committing the wrongful act without justification, excuse, or mitigation." *Currie*, 911 F.3d at 1054 (quotations omitted).

ii. Aiding and abetting liability

"Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a). "For an aiding and abetting conviction, the Government must prove that the defendant (1) willfully associated himself with the criminal venture and (2) sought to make the venture succeed through some action of his own." *United States v. Rosalez*, 711 F.3d 1194, 1205 (10th Cir. 2013) (quotations and brackets omitted); *see* 18 U.S.C. § 2. "The aider must have the *mens rea* to bring about the result committed by the other principals." *United States v. Cooley*, 1 F.3d 985, 997 (10th Cir. 1993).

In *Pluma*, we affirmed the denial of a lesser-included offense instruction on manslaughter when the defendant was charged with aiding and abetting second-degree murder. 511 F. App'x at 710. The defendant—a prison inmate—and several codefendants beat another inmate to death. *Id.* He argued for a manslaughter instruction because he did not strike the fatal blow. *Id.* We held that the district court properly denied the manslaughter instruction:

> By assisting in the assault of [the victim], during which [the victim] was repeatedly hit on the head leading to his death, [the defendant] is guilty of second degree murder as an aider or abettor even if he did not hit [the victim] on the head. At the very least, he aided the attacker who murdered [the victim].

*Id.*

14

In *United States v. Woody*, 250 F. App'x 867, 868 (10th Cir. 2007) (per curiam) (unpublished), the defendant was convicted of second-degree murder and aiding and abetting second-degree murder. The evidence showed he and others beat and kicked the victim, who later died from stab wounds. *Id.* at 875-76. We held the evidence was insufficient to sustain the aiding and abetting conviction because "the government was required to prove [the defendant] participated in the assault and battery of [the victim] intending (or reasonably expecting) it would bring about his death." *Id.* at 878. We reasoned that "[a]n unpredictable stabbing during the assault (and certainly not later) would not satisfy that requirement." *Id.*

3. **Analysis**

The parties do not dispute that Mr. Oldman requested a lesser-included offense instruction on ARISBI. Rather, they contest the other lesser-included instruction requirements—whether the elements of ARISBI are included in the elements of first-degree murder (the *Schmuck* test), whether an element differentiating the two offenses is in dispute, and whether a rational jury could acquit Mr. Oldman of first-degree murder and convict him of ARISBI. *See Waugh*, 950 F.3d at 667.

Mr. Oldman argues the district court erred under the *Schmuck* elements test when it failed to instruct the jury on ARISBI as a lesser-included offense of first-degree murder, but we do not need to address this requirement to resolve this appeal. Instead, we affirm based on the last requirement—that a rational jury could acquit on the greater offense. Mr. Oldman has not "'convinced' [us] a rational jury could convict on the lesser

15

charge and acquit on the greater charge." *Pacheco*, 884 F.3d at 1048. He argues a rational jury could have concluded Mr. Whiteplume killed Mr. Dodge by cutting his throat, and therefore could have acquitted him of committing first-degree murder as a principal. But even if that were so, and even if a rational jury could have convicted him of ARISBI, it could not have acquitted Mr. Oldman of aiding and abetting Mr. Dodge's murder. We therefore affirm on this basis.

a. *Principal liability*

At trial, the jury heard evidence that Mr. Oldman cut Mr. Dodge's throat. Mr. Whiteplume testified that Mr. Oldman brandished a knife and said Mr. Dodge was "going to die tonight." ROA, Vol. 3 at 606. According to Mr. Whiteplume, Mr. Oldman "ma[d]e four or five tugging motions" at Mr. Dodge's throat, and he "died right there." *Id.* at 613-14. Donna Oldman testified that Mr. Oldman later said he "did the worst possible." *Id.* at 897. And Ms. Guffey said Mr. Oldman told her, "Babe . . . I'm a killer. I'm a killer." *Id.* at 912.

But the jury also heard evidence suggesting Mr. Whiteplume cut Mr. Dodge's throat. According to Ms. Brown, Mr. Whiteplume told her that he "had to slice [Mr. Dodge's] throat." *Id.* at 539. Mr. Whiteplume's and Mr. Dodge's DNA were found on the "inside collar and the underarm area of [a] sweatshirt" near the crawlspace. *Id.* at 799. And Bridget Oldman testified that, after Mr. Dodge's death, she asked Mr. Oldman "if he did it," and he responded, "No, but I helped." *Id.* at 692. "[G]iv[ing] full credence to [this] testimony," a rational jury could find that Mr. Whiteplume, not Mr. Oldman, cut

16

Mr. Dodge's throat, *Brown*, 287 F.3d at 974, and that Mr. Oldman was not guilty as a principal.

b.  *Aiding and abetting liability*

i.  Uncontradicted evidence

Even if Mr. Whiteplume cut Mr. Dodge's throat, a rational jury could not have acquitted Mr. Oldman of aiding and abetting the murder.  *See Pacheco*, 884 F.3d at 1048. The evidence showed that (1) he brutally beat Mr. Dodge with a wrench and crowbar, recruited others to join the beating, and incapacitated Mr. Dodge; (2) the injuries from the beating would have killed Mr. Dodge in hours "at most" without medical attention; (3) he and Mr. Whiteplume left Mr. Dodge in the crawlspace and unplugged the basement freezer to mask the smell of a rotting corpse; and (4) he confessed he "helped" kill Mr. Dodge.  Based on this uncontradicted evidence, Mr. Oldman at least aided and abetted the first-degree murder of Mr. Dodge.  No rational jury could conclude otherwise.

First, as Ms. Brown reported, Mr. Oldman used a wrench and crowbar to beat Mr. Dodge, breaking his arm, leg, ribs, facial bones, and teeth, and causing subdural hemorrhage.  *See* ROA, Vol. 3 at 532, 570-573, 929-32, 969, 976.  Ms. Brown and Mr. Whiteplume said that Mr. Oldman initiated the attack and recruited Mr. Whiteplume and Mr. Tabaho to participate.  *Id.* at 531, 594-96.

Second, Dr. Burson testified that, even if Mr. Dodge's throat had not been cut, his wounds from the beating would have killed him in a couple hours "[a]t most" without medical treatment.  ROA, Vol. 3 at 969-70.  Mr. Oldman argues that "[t]he best the

17

Government could get out of [Dr.] Burson is that the blunt-force injuries by themselves 'could have' or 'may have' killed [Mr.] Dodge without 'medical attention.'" Aplt. Br. at 18 (quoting ROA, Vol. 3 at 954). But when asked to clarify, Dr. Burson said that "if there were no sharp injuries to the throat," Mr. Dodge would have survived only a couple hours "[a]t most." ROA, Vol. 3 at 970.

Third, Mr. Oldman and Mr. Whiteplume left Mr. Dodge in the crawlspace. *Id.* at 533-34, 610-11. According to Ms. Brown, Mr. Oldman unplugged the nearby freezer "so they won't—in case he rots, they won't smell him." *Id.* at 534. When the coroner found the body in the crawlspace, there was "[s]ome extremely spoiled meat" in the freezer. *Id.* at 440.

Fourth, three witnesses testified that Mr. Oldman admitted to at least aiding and abetting Mr. Dodge's murder. He told (1) Donna Oldman he "did the worst possible," *id.* at 897; (2) Ms. Guffey, "Babe . . . I'm a killer. I'm a killer," *id.* at 912; and (3) Bridget Oldman that he "helped" kill Mr. Dodge, *id.* at 692. Ms. Guffey described how Mr. Oldman brought her to the basement days after the murder, spat into the crawlspace, and said, "You stink." *Id.* at 915-16.

\* \* \* \*

The evidence showed Mr. Oldman at least aided and abetted the murder. He "participated in the assault and battery of [Mr. Dodge] intending (or reasonably expecting) it would bring about his death." *Woody*, 250 F. App'x at 879. In addition to the beating, he helped conceal the murder by leaving Mr. Dodge, severely injured and

18

barely breathing, in the crawlspace and unplugging the freezer to mask the smell of the decomposing body. *See Cupit v. Whitley*, 28 F.3d 532, 541 (5th Cir. 1994) (finding, as evidence of the defendant's "specific intent to aid and abet [the alleged principal] in the killing," that, "far from comforting or assisting [the victim], [the defendant] actually continued to assist [the alleged principal] in covering up the murder").

We thus conclude that, by initiating the assault, recruiting others to join, inflicting brutal injuries with dangerous weapons, and concealing the body, Mr. Oldman "[a]t the very least . . . aided" Mr. Whiteplume and was guilty "as an aider or abettor even if he did not" cut Mr. Dodge's throat. *Pluma*, 511 F. App'x at 710.[7]

### ii. Mr. Oldman's arguments

Mr. Oldman, relying on our unpublished opinion in *Woody*, argues a rational jury could have acquitted him of aiding and abetting. He claims the evidence showed he "abandoned [his] attack and did not take part in the separate and discreet [sic] later attack by [Mr.] Whiteplume which did kill [Mr. Dodge], and therefore did not aid and abet [Mr.] Dodge's Murder." Aplt. Reply Br. at 11. He points to Ms. Brown's testimony that

---

[7] Mr. Oldman attempts to distinguish *Pluma*, arguing that, "[h]ere, unlike *Pluma*, there was no single group beating that unquestionably caused the victim's death." Aplt. Reply Br. at 10. But there was, as in *Pluma*, a single-group beating led by Mr. Oldman. 511 F. App'x at 708. According to Dr. Burson, the blunt-force trauma would have caused Mr. Dodge's death in hours "at most" without medical treatment. ROA, Vol. 3 at 969-70. That Mr. Dodge may have survived in the crawlspace until after Mr. Oldman left the house is immaterial. So too is the evidence that Mr. Whiteplume may have delivered another fatal blow—cutting Mr. Dodge's throat while he was severely incapacitated from the beating. Mr. Oldman was instrumental in facilitating each step leading to Mr. Dodge's death.

19

Mr. Dodge's throat had not been cut when she left the basement, ROA, Vol. 3 at 535, and Ms. Dewey's testimony that Mr. Oldman yelled from the porch, "Let him go after I leave," *id.* at 830. We reject these arguments.

First, this case is not like *Woody*. There, we overturned the defendant's aiding and abetting conviction because he could not have predicted the victim would die from a stabbing. Here, Mr. Oldman easily could predict Mr. Dodge would die from his beating him with a crowbar and wrench, breaking bones and causing other severe trauma, leaving the body incapacitated and barely breathing in the crawlspace, and masking the decomposition smell by unplugging the freezer.

Second, not only was Mr. Dodge's death predictable, Mr. Oldman also "knew or should have known a dangerous weapon would be employed such that the jury could infer he appreciated the risk of mortal injury and participated in the assault nonetheless." *Woody*, 250 F. App'x at 878-79. Ms. Brown testified that Mr. Whiteplume suggested to Mr. Oldman that they should cut Mr. Dodge's throat during the beating. She also said that Mr. Tabaho had a knife. *See* ROA, Vol. 3 at 556. And she reported that Mr. Oldman used a wrench and crowbar during the beating. *Id.* at 554, 570-73. Mr. Whiteplume testified that Mr. Oldman pulled out a knife and said Mr. Dodge was "going to die tonight." *Id.* at 606. The throat cut was not "[a]n *unpredictable* stabbing." *Woody*, 250 F. App'x at 878-79 (emphasis added). To the contrary, fatal attacks were predictable, whether from blunt-force trauma or sharp-force injury, and whether inflicted by Mr. Oldman or Mr. Whiteplume.

20

Third, Mr. Oldman did not abandon his aiding and abetting. Even assuming Mr. Dodge's throat had not been cut and he was still alive when Mr. Oldman left the house, Mr. Oldman aided and abetted the murder by playing a dominant and integral role in the events leading to his death—far exceeding the low threshold for aiding and abetting liability. *See United States v. Burks*, 678 F.3d 1190, 1195 (10th Cir. 2012) (noting the "relatively minor participation that can trigger accomplice liability," including "merely encouraging the principal"); *United States v. McKneely*, 69 F.3d 1067, 1072 (10th Cir. 1995) (holding that the jury could convict the defendant of aiding and abetting cocaine possession with intent to distribute because the "defendant initiated [the principal's] travel to Denver with the cocaine, . . . notwithstanding [the principal's] testimony that defendant was not the person who actually gave her the drugs").

Fourth, Mr. Oldman's statement as he left the house to "[l]et him go after I leave" provides no rational basis to relieve him of aiding and abetting liability, especially in light of the evidence summarized above. *See Pacheco*, 884 F.3d at 1048 & n.18 (affirming denial of a simple possession instruction despite the defendant's "admi[ssion] to being a drug user but not a drug distributor," because "[a]ll relevant factors—amount, packaging, and physical evidence—all militate in favor of distribution rather than simple possession"). Contrary to Mr. Oldman's argument, the statement would not have allowed a rational jury to conclude he "effectively withdrew from the criminal venture." Aplt. Reply Br. at 11 n.8. Even if withdrawal from aiding and abetting were legally possible, *see Burks*, 678 F.3d at 1195, Mr. Oldman did not do so. He aided and abetted the murder

21

by initiating and leading the beating, striking fatal blows with dangerous instruments, and concealing the body, and then did nothing before Mr. Dodge died to secure medical assistance or prevent further harm to Mr. Dodge. Moreover, he did not raise the affirmative defense of withdrawal at trial, so the jury could not have acquitted him on that basis. *See United States v. Hughes*, 191 F.3d 1317, 1322 (10th Cir. 1999) ("[T]he defendant bears the burden of establishing withdrawal . . . .").

* * * *

The district court did not err in denying the requested lesser-included offense instruction. The jury could not have acquitted Mr. Oldman of aiding and abetting first-degree murder.

### B. *Graphic Photos*

Mr. Oldman alleges the district court "mishandl[ed]" the photos of Mr. Dodge's body. Aplt. Br. at 39. He argues the court erred by (1) conducting inadequate voir dire to warn jurors and gauge their ability to review graphic images and (2) admitting 10 of the photos at trial.

### 1. **Standard of Review**

Because Mr. Oldman did not present either of these objections to the district court, we review for plain error.[8] *See United States v. McGlothin*, 705 F.3d 1254, 1260 (10th Cir. 2013) (reviewing an unpreserved evidentiary claim for plain error); *United States v.*

---

[8] Mr. Oldman argues we should review for abuse of discretion. Aplt. Br. at 28. His argument does not matter because, as explained below, we find the district court did not abuse its discretion at step one of plain error review.

*Portillo-Quezada*, 469 F.3d 1345, 1349 (10th Cir. 2006) (per curiam) (reviewing an unpreserved challenge to voir dire for plain error). "Plain error exists only when there is (1) error, (2) that was plain, (3) affecting substantial rights, and (4) going to the fairness, integrity or public reputation of the judicial proceedings." *Portillo-Quezada*, 469 F.3d at 1349.

2. **Additional Factual Background**

Months before trial, the Government filed a notice of intent to introduce the photos. Before voir dire, the district court acknowledged the jury would need to look at the photos to determine what happened to Mr. Dodge, noting that the court would "limit them as much as possible." ROA, Vol. 3 at 210.

During voir dire, the judge asked the prospective jurors:

> Ladies and gentlemen, this case involves an allegation of murder. You will hear evidence, see evidence that may be disturbing. Do any of you have any issues, worries, concerns, thoughts about how you may feel having to listen to or see graphic images from a coroner, from a pathologist? Is there anybody?

*Id.* at 298. Nobody responded.

The judge reiterated:

> [W]ith regards to some of the exhibits in this matter, . . . you'll be required as jurors, if selected to serve in this matter, to critically view, analyze, and consider all the evidence. And that will include potentially photographs and/or graphic images. Does anyone have any concerns as to their ability to do so? If so, please raise your hand. All right. I don't see any raised hands.

*Id.* at 302.

At trial, Dr. Burson relied on six postmortem photos of Mr. Dodge's head to explain his injuries, and Coroner Stratmoen relied on four to describe the body as he found it in the crawlspace. The court admitted 10 of the photos into evidence. Mr. Oldman did not object.

3. **Additional Legal Background**

a. *Voir dire*

"[P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). "The principles governing the sufficiency of voir dire questions derive from the Sixth Amendment guarantee of an impartial jury in criminal prosecutions." *United States v. Baker*, 638 F.2d 198, 200 (10th Cir. 1980). "The trial court, however, retains great latitude in conducting *voir dire*, and the Constitution does not require an additional opportunity to make a searching inquiry." *Sallahdin v. Gibson*, 275 F.3d 1211, 1223 (10th Cir. 2002) (citation omitted).

b. *Admissibility of graphic photos*

Federal Rules of Evidence 401, 402, and 403 govern the admissibility of the photos. Rule 401 provides: "Evidence is relevant if . . . it has any tendency to make a fact more or less probable . . . and . . . the fact is of consequence in determining the action." Fed. R. Evid. 401. Rule 402 states: "Relevant evidence is admissible unless any of the following provides otherwise: [The United States Constitution[,] a federal statute[,] these rules[,] or [] other rules prescribed by the Supreme Court," and

24

"[i]rrelevant evidence is not admissible." *Id.*, 402.  Rule 403 instructs:  "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . or needlessly presenting cumulative evidence."  *Id.*, 403.

"[E]xclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly."  *United States v. Silva*, 889 F.3d 704, 712 (10th Cir. 2018) (quotations omitted).  Evidence may be unfairly prejudicial if it has the capacity to "'lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.'"  *United States v. Durham*, 902 F.3d 1180, 1224 (10th Cir. 2018) (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)).

Although "[t]he risk that introducing graphic evidence of brutal murders will give rise to emotional reactions poses a legitimate risk of unfair prejudice, . . . the vicious, brutal nature of a defendant's conduct is not itself sufficient to justify a complete exclusion of evidence tending to show the defendant engaged in those acts."  *United States v. Lujan*, 603 F.3d 850, 858 (10th Cir. 2010).  We have held that district courts have discretion to admit graphic photos that are probative and "aid in illustrating the testimony of the pathologist."  *United States v. Soundingsides*, 820 F.2d 1232, 1243 (10th

25

Cir. 1987) (quotations omitted).[9] District courts thus typically have discretion to admit graphic photos that add relevant detail or support relevant medical testimony.[10]

4. **Analysis**

The district court did not plainly err in (a) conducting voir dire, and (b) admitting the photos.

a. *Voir dire*

The district court did not err, let alone plainly err, in conducting voir dire regarding the photos. The judge told the prospective jurors they would "hear [and] see evidence that may be disturbing." ROA, Vol. 3 at 298. He confirmed they had no "issues, worries, concerns, [or] thoughts about" having to "see graphic images from a coroner [or] a pathologist." *Id.* at 298, 302.

---

[9] *See also United States v. Sarracino*, 340 F.3d 1148, 1168 (10th Cir. 2003) ("We agree with the trial judge that this photo, although somewhat gruesome, was not unduly so and was admitted for a proper purpose of assisting the government's medical expert in her description of the injuries the victim had sustained."); *United States v. Mills*, No. 95-1319, 1996 WL 167695, at *3 (10th Cir. Apr. 10, 1996) (unpublished) ("It is well-settled that photographs showing the extent of injuries suffered by a crime victim are admissible because they give the jury a more complete understanding of the events and can assist medical experts in their testimony.").

[10] *Compare United States v. Naranjo*, 710 F.2d 1465, 1470 (10th Cir. 1983) (holding the district court had discretion to admit a photo of a victim's bloody body because "it was probative to some extent of what occurred" and the manner of death), *and United States v. Nelson*, 801 F. App'x 652, 659 (10th Cir. 2020) (unpublished) (affirming the admission of gory photos of a victim's body because they belied the defendant's claim that the victim was "okay" when he left the scene), *with United States v. Smith*, 534 F.3d 1211, 1219 (10th Cir. 2008) (noting that graphic photos that "add[ed] nothing to the description of the bullet-ridden bodies *except* shock" would be unfairly prejudicial under Rule 403).

Mr. Oldman identifies no case suggesting this voir dire was insufficient. And the court allowed Mr. Oldman's counsel to ask additional questions, so Mr. Oldman had the opportunity to address the graphic images. *See United States v. Shelton*, 736 F.2d 1397, 1408 (10th Cir. 1984) (finding no error when "counsel were provided full opportunity to recommend specific voir dire questions").

Mr. Oldman argues voir dire was inadequate because the judge told the prospective jurors only that "there was a *potential*" for disturbing images and that the photos "*may* be graphic." Aplt. Br. at 27. He fails to explain why the court's use of contingent language makes a difference, nor does he cite any precedent suggesting a district judge must inform prospective jurors they will definitely see disturbing photos. Regardless, the judge also told the prospective jurors, "You *will* hear [and] see evidence that may be disturbing." ROA, Vol. 3 at 298 (emphasis added). The district court acted within its "great latitude in conducting *voir dire*." *Sallahdin*, 275 F.3d at 1223.

b. *Admitting the photos*

Nor did the district court err in admitting the photos. The pathologist, Dr. Burson, analyzed six of the photos to determine which injuries Mr. Dodge sustained before and after his death. *See, e.g.*, ROA, Vol. 3 at 934 ("If we're all looking at this image and we're looking at the top part or the anterior portion of his neck, it's very dark in color. . . . So that's an antemortem injury."); *id.* at 957 ("So these cuts over here appear to be postmortem in nature as opposed to the anterior neck where they appear to be antemortem due to the presence of hemorrhage."); *id.* at 933, 936-37, 939-40, 955-57.

27

Dr. Burson also used the photos to explain which injuries could have killed Mr. Dodge. *See, e.g.*, *id.* at 935 ("[The sharp-force injuries] definitely would have resulted in death.").

Given the issues at trial about how Mr. Dodge died and who killed him, the photos were relevant and admissible under Rules 401 and 402. They also were "a substantial aid in illustrating the testimony of the pathologist." *Soundingsides*, 820 F.2d at 1243.

Mr. Oldman argues under Rule 403 that the photos' danger of creating unfair prejudice substantially outweighed their probative value because they showed Mr. Dodge's head after Mr. Whiteplume and Mr. Tabaho had disfigured it. But Dr. Burson relied on the photos to identify which injuries occurred before Mr. Whiteplume and Mr. Tabaho had disfigured the body. *See, e.g.*, ROA, Vol. 3 at 934-35.

Mr. Oldman also argues admitting all 10 photos—including the four introduced through Coroner Stratmoen—was unreasonably cumulative. But, as Dr. Burson testified, the various depictions of "the body from different angles and vantage points" showed different injuries. *Soundingsides*, 820 F.2d at 1243; ROA, Vol. 3 at 936 ("We also at this perspective can see the sharp-force injury to the bridge of the nose."). And even if the four photos introduced through Coroner Stratmoen did not add much, Mr. Oldman has not shown their cumulative nature "substantially outweigh[ed]" their probative value given that Dr. Burson relied on the other six. *See* Fed. R. Evid. 403; *United States v.*

28

*Burgess*, 576 F.3d 1078, 1100 (10th Cir. 2009) ("Considering whether to admit 'more of the same' is a judgment call best made by the trial judge.").[11]

### C. *Fifth Amendment*

Mr. Oldman argues the district court erred by allowing Mr. Tabaho to invoke his Fifth Amendment privilege to refuse to testify for the defense.

### 1. Standard of Review

"Whether an individual may properly invoke the privilege against self-incrimination is a question of law, which we review de novo." *United States v. Rivas-Macias*, 537 F.3d 1271, 1278 (10th Cir. 2008). Mr. Oldman preserved this issue by objecting at trial.

### 2. Additional Factual Background

When the defense called Mr. Tabaho to testify, he said he intended to invoke his Fifth Amendment privilege against self-incrimination. Defense counsel explained to the court that she intended to ask whether Mr. Tabaho had disfigured Mr. Dodge's body at Mr. Whiteplume's direction. She argued Mr. Tabaho's plea agreement required him to testify. The agreement prevented prosecution of Mr. Tabaho for statements made in cooperation with the Government.

---

[11] Also, any error in admitting the four photos was harmless given that six similarly graphic photos were properly admitted and the evidence of Mr. Oldman's guilt was otherwise overwhelming. *See, e.g.*, *Smith*, 534 F.3d at 1220 (finding any error in admitting photos harmless because the "remaining evidence against [the defendant] was so strong").

The district court had Mr. Tabaho testify outside the presence of the jury to determine whether he could invoke the Fifth Amendment. Mr. Oldman's counsel asked Mr. Tabaho about his and Mr. Whiteplume's roles in disfiguring Mr. Dodge's body after the murder. Mr. Tabaho declined to answer any of the questions, invoking the Fifth Amendment privilege against self-incrimination. The prosecutor did not cross-examine Mr. Tabaho, explaining he "ha[d] no basis to cross-examine him, because he's given no answer." ROA, Vol. 3 at 1051. The court asked the Government if it would offer Mr. Tabaho immunity for his testimony. The prosecutor declined.

The district court decided it would not require Mr. Tabaho to testify in front of the jury. It concluded that almost "all of the questions that were asked would appear to potentially implicate him as being involved in criminal conduct or at least provide a chain linking him to that criminal conduct." *Id.* at 1055. Nonetheless, the court allowed FBI Agent Coble to testify about what Mr. Tabaho told her about his role in disfiguring Mr. Dodge's body. *Id.* at 1065-73.

3. **Additional Legal Background**

This issue implicates (a) a defendant's right to present a defense and (b) a witness's right to refuse to testify.

a. *Right to present a defense*

The Fifth and Sixth Amendments guarantee a defendant the "right to present a defense." *United States v. Markey*, 393 F.3d 1132, 1135 (10th Cir. 2004). This right includes presenting witnesses and cross-examining opposing witnesses. *See id.* It "is

30

predicated on the Sixth Amendment's confrontation and compulsory process clauses, as well as the Fifth Amendment's guarantee of due process." *Rivas-Macias*, 537 F.3d at 1277.

"[T]he right to present a defense, while fundamental, is not absolute." *Id.* at 1278 (quotations omitted). It "must bow to accommodate legitimate, competing interests in the criminal trial process . . . including the Fifth Amendment privilege against self-incrimination." *Id.*

A witness's refusal to testify under the Fifth Amendment does not "unduly impair[]" the defendant's right to present a defense unless the government "substantial[ly] interfere[d] with [the] decision to claim the privilege." *Id.* at 1278 & n.10. "Interference is substantial when the government actor <u>actively discourages</u> a witness from testifying through threats of prosecution, intimidation, or coercive badgering." *United States v. Dalton*, 918 F.3d 1117, 1130 (10th Cir. 2019) (quotations omitted).

### b. *Privilege against self-incrimination*

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "[T]he privilege against self-incrimination protects a witness as well as an accused party." *Rivas-Macias*, 537 F.3d at 1276 n.8 (quotations omitted). "Thus, it is immaterial, for purposes of the Fifth Amendment, whether the prosecution at hand is against the individual invoking the privilege." *Id.* (quotations omitted).

31

In determining whether the privilege applies, "we must ascertain: ([i]) whether [the witness] faced some authentic danger of further incriminating himself by testifying . . . , and ([ii]) whether [the witness] waived his Fifth Amendment privilege." *Id.* at 1278.

i.  Authentic danger

"Not much is required . . . to show an individual faces some authentic danger of self-incrimination, as the privilege extends to admissions that may only *tend* to incriminate." *Id.* (citation and quotations omitted). "[A]n individual does not lose his right to claim the Fifth Amendment privilege merely because a successful prosecution is unlikely to add to the punishments he already faces for other crimes." *Id.* (quotations omitted). "To the contrary, we will uphold an individual's invocation of the privilege against self-incrimination unless it is 'perfectly clear, from a careful consideration of all the circumstances in the case,' that the witness 'is mistaken' and his answers could not 'possibly have' a 'tendency to incriminate.'" *Id.* at 1278-79 (quoting *Hoffman v. United States*, 341 U.S. 479, 488 (1951)). "A defendant facing impending sentencing legitimately may fear incurring additional criminal liability through compelled testimony." *United States v. Castorena-Jaime*, 285 F.3d 916, 931 (10th Cir. 2002).

ii.  Waiver

A witness may waive the privilege against self-incrimination by (1) "fail[ing] to assert it in a timely fashion," (2) receiving immunity from the government against "'use of his compelled answers' and all 'evidence derived therefrom in any subsequent criminal

case in which he is a defendant,'" or (3) voluntarily testifying about the subject in question. *Rivas-Macias*, 537 F.3d at 1280 (quoting *Maness v. Meyers*, 419 U.S 449, 466 (1975) and *Lefkowitz v. Turley*, 414 U.S. 70, 78, 94 (1973)). Waiver of the Fifth Amendment privilege is limited to the proceeding in which the waiver occurs. *Id.* (citing *United States v. Licavoli*, 604 F.2d 613, 623 (9th Cir. 1979)).

4. **Analysis**

The district court did not err by allowing Mr. Tabaho to decline to testify. Almost all of defense counsel's questions for Mr. Tabaho called for potentially incriminating responses. *See generally* ROA, Vol. 3 at 1040-50; *see, e.g.*, *id.* at 1044 ("Did you cut [Mr. Dodge's] face? . . . Did you punch Mr. Dodge?); *id.* at 1047 ("[B]efore you tried to cut up Mr. Dodge, did Mr. Whiteplume ask you to wrap up the body and try to put it in a crawl space?"). It is not "'perfectly clear, from a careful consideration of all the circumstances in the case,' that [Mr. Tabaho] 'is mistaken' and his answers could not 'possibly have' a 'tendency to incriminate.'" *Rivas-Macias*, 537 F.3d at 1279 (quoting *Hoffman*, 341 U.S. at 488).

Mr. Oldman argues Mr. Tabaho faced no authentic danger because he had "already given all of this information not only to FBI agents, but to the trial prosecutor himself, as part of his 'cooperation.'" Aplt. Br. at 48. And he already had pled guilty to being an accessory after the fact to second-degree murder. But Mr. Tabaho had not been sentenced in his case when he was called to testify in Mr. Oldman's trial, and could "fear

33

incurring additional criminal liability through compelled testimony." *Castorena-Jaime*, 285 F.3d at 931.

Mr. Oldman also argues that Mr. Tabaho faced no authentic danger because he entered a cooperation agreement with the government providing immunity. But the cooperation agreement protected Mr. Tabaho against further prosecution for statements he makes while cooperating with the government. He was not cooperating with the government when Mr. Oldman called him as a defense witness against the Government at trial.

Moreover, the plea agreement said only that Mr. Tabaho's statements will not be used against him. It did not immunize him from prosecution based on additional evidence his statements reveal. *See Rivas-Macias*, 537 F.3d at 1280 (holding that a witness may refuse to testify to avoid the possible "use of his compelled answers *and all evidence derived therefrom* in any subsequent criminal case in which he is a defendant" (quotations omitted and emphasis added)).

Finally, Mr. Oldman claims "the Government substantially interfered with the presentation of the defense" by not granting Mr. Tabaho immunity and not calling him as a prosecution witness. Aplt. Br. at 48-49. But Mr. Oldman has failed to show the Government had any obligation to do either, and he has not shown substantial interference such as "threaten[ed] prosecution, intimidation, or coercive badgering." *Dalton*, 918 F.3d at 1130.

In short, Mr. Oldman has not shown the court erred in allowing Mr. Tabaho to invoke his Fifth Amendment privilege.

### D. *Mr. Oldman's Other Arguments*

Mr. Oldman also argues (1) the district court judge engaged in improper ex parte communications with the jury, (2) mishandled the spousal privilege, and (3) that his counsel was ineffective. We reject each argument.

### 1. **Ex Parte Communication**

Mr. Oldman argues the following colloquy with counsel for both parties revealed that the district court engaged in improper ex parte communications with a juror:

> THE COURT: Just for the record, I want to note Juror Number 52. She's been paying attention, but she's had a box of Kleenex and has - some of the pictures have been particularly tough and challenging for everyone. We have verified she's okay. She's good to go. She just doesn't want to draw attention and verify that she's capable of going forward. So I don't see any need to do anything further.
>
> [Government], any concerns?
>
> [GOVERNMENT'S COUNSEL]: No, Your Honor.
>
> THE COURT: [defense counsel]?
>
> [DEFENSE COUNSEL]: No, Your Honor.

ROA, Vol. 3 at 960.

As Mr. Oldman acknowledges, "the district court did not identify who the 'we' was who spoke with Juror 52." Aplt. Br. at 34. Because the record does not show whether the judge communicated with any jurors ex parte, "plain error review is not

35

possible because [Mr. Oldman] has failed to develop the record sufficiently for such review." *United States v. Charles*, 576 F.3d 1060, 1066 (10th Cir. 2009); *see also Smallwood v. Gibson*, 191 F.3d 1257, 1279 n.14 (10th Cir. 1999) (rejecting an argument that "the lack of a record is itself indicative that improper ex parte communications occurred between the judge and jury"); *United States v. Carter*, 973 F.2d 1509, 1515 (10th Cir. 1992) (reviewing for plain error when the defendant failed to object to allegedly improper ex parte communications between the judge and jury).

In any event, the court gave the parties "the opportunity to pursue the matter further," and they declined, thus precluding plain error. *United States v. McDonald*, 933 F.2d 1519, 1525 (10th Cir. 1991); *see id.* (finding no plain error based on the court's ex parte communication with the jury because "[d]efense counsel was not left in the dark as to what occurred" and indicated she "felt no prejudice existed at that time").[12]

2. **Spousal Privilege**

Mr. Oldman argues the district court erred when it (a) declined to strike the testimony of Dionne Addison—his wife at the time of trial—which she gave before he invoked spousal privilege, and (b) required him to invoke spousal privilege in front of the jury. But Mr. Oldman did not object on these grounds at trial and he does not argue plain error on appeal, so these issues are waived. *See Richison v. Ernest Grp., Inc.*, 634 F.3d

---

[12] Mr. Oldman also contends that "no further inquiry was made *of all the jurors* to determine whether they, too, were capable of going forward." Aplt. Br. at 36 (quotations omitted). But that has nothing to do with the alleged ex parte communication.

1123, 1131 (10th Cir. 2011) ("[T]he failure to argue for plain error and its application on appeal[] surely marks the end of the road for an argument for reversal not first presented to the district court."); *United States v. Leffler*, 942 F.3d 1192, 1199 (10th Cir. 2019).

His arguments fail in any event. First, he cites no case requiring a court to strike testimony given *before* the defendant invokes spousal privilege. Second, Federal Rules of Evidence 103(d) and 104(c)(3), on which he relies, require courts to prevent jurors from hearing inadmissible evidence, Fed. R. Evid. 103(d), and to hold hearings on preliminary questions out of the jury's presence "if justice so requires," *id.*, 104(c)(3). Neither requires a court to prevent the jury from hearing a defendant invoke spousal privilege.

## 3. **Ineffective Assistance of Counsel**

Finally, Mr. Oldman argues we should find ineffective assistance of counsel if we determine his trial attorneys failed to preserve any of the issues he raises on appeal. We decline to consider this argument. Ineffective assistance claims "should be brought in collateral proceedings, not on direct appeal," and Mr. Oldman fails to identify an applicable exception. *United States v. Galloway*, 56 F.3d 1239, 1240 (10th Cir. 1995) (en banc).

### III. **CONCLUSION**

We affirm the district court's judgment.[13]

---

[13] Mr. Oldman's cumulative error argument fails because he does not identify multiple errors. *See Hooks v. Workman*, 689 F.3d 1148, 1195 (10th Cir. 2012) ("[W]e undertake a cumulative-error analysis only if there are at least two errors.").